**\*\*\* FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND THE PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCOT-21-0000581
20-JUN-2024
07:55 AM
Dkt. 1586 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

SURFACE WATER USE PERMIT APPLICATIONS,
INTEGRATION OF APPURTENANT RIGHTS AND
AMENDMENTS TO THE INTERIM INSTREAM FLOW STANDARDS,
NĀ WAI ʻEHĀ SURFACE WATER MANAGEMENT AREAS OF
WAIHEʻE RIVER, WAIEHU STREAM, WAILUKU RIVER
(PREVIOUSLY KNOWN AS ʻĪAO STREAM)
AND WAIKAPŪ STREAM, MAUI

SCOT-21-0000581

APPEAL FROM THE COMMISSION ON WATER RESOURCES MANAGEMENT
(CASE NO. CCH-MA 15-01 (Agency Appeal))

JUNE 20, 2024

RECKTENWALD, C.J., McKENNA, AND EDDINS, JJ.,
CIRCUIT JUDGE NAKAMOTO AND CIRCUIT JUDGE HAMMAN,
ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This is a direct agency appeal from the Commission on Water Resource Management ("the Commission") concerning Nā Wai ʻEhā, or "the four great Waters of Maui."  Nā Wai ʻEhā encompasses Waiheʻe River, Waiehu Stream (North and South), Wailuku River (formerly

ʻĪao Stream), and Waikapū Stream, and their surrounding ahupuaʻa, or watersheds. MMK Maui, LP ("MMK"), Hui o Nā Wai ʻEhā and the Maui Tomorrow Foundation ("the Hui/MTF"), the Office of Hawaiian Affairs ("OHA"), Mahi Pono, LLC ("Mahi Pono"), and Wailuku Water Company, LLC ("WWC"), appeal from the Commission's Findings of Fact, Conclusions of Law, and Decision and Order issued June 28, 2021 ("D&O II"), as amended by Errata issued June 30, 2021 ("errata") (together "final decision").

MMK owns and operates two golf courses in the Nā Wai ʻEhā area. The Hui/MTF are community groups with Native Hawaiian members who reside on or have property interests in the area. Mahi Pono engages in diversified agricultural operations on former sugar plantation lands it owns in the area. WWC operates the Nā Wai ʻEhā ditch system built during the plantation era; it diverts water from the streams to points of delivery for other users based largely on commercial contracts.

In 2008, the Commission designated Nā Wai ʻEhā as a Surface Water Management Area ("SWMA"). The designation triggered statutory provisions in the state Water Code requiring existing and new water users to file surface water use permit applications ("SWUPAs"). Over 140 applicants filed SWUPAs, including MMK, Hawaiian Commercial & Sugar Co. ("HC&S") (Mahi Pono's predecessor), and WWC.

2

Then, in 2016, HC&S, the last remaining sugar plantation on Maui, announced closure of operations. The Hui/MTF filed a petition with the Commission to amend Nā Wai ʻEhā's Interim Instream Flow Standards ("IIFS") in light of that closure. The Commission consolidated the SWUPA and IIFS proceedings. After a contested case hearing, HC&S sold its land to Mahi Pono and Mahi Pono was substituted as the applicant in HC&S's SWUPA.

On June 28, 2021, the Commission issued its D&O II, in which it amended the IIFS for Nā Wai ʻEhā and granted various applicants surface water use permits ("SWUPs"). Two days later, the Commission issued an errata to the D&O II, in which it made corrections to its findings and conclusions regarding Mahi Pono's SWUP and reduced Mahi Pono's water allocation accordingly.

On appeal, the Hui/MTF and OHA together argue the Commission failed to comply with its constitutional and statutory mandates to restore Nā Wai ʻEhā stream flows to the extent practicable and to justify its IIFS decisions through findings of fact ("FOFs") and conclusions of law ("COLs"). MMK, Mahi Pono, and WWC each contend the Commission violated their due process rights and challenge their respective SWUPs. MMK and Mahi Pono argue their respective SWUP water allocations are clearly erroneous because they are not based on their actual water needs. MMK also argues the Commission erroneously and/or

arbitrarily classified its golf course water use at the same water duty as "diversified agriculture," engaged in unlawful rulemaking and/or policymaking through adjudication in violation of the Hawai'i Administrative Procedure Act ("HAPA"), and abused its discretion in denying MMK's request to monitor its water use based on a 12-month moving average ("12-MAV") standard. WWC challenges various directives and/or conditions related to its SWUP for system losses. WWC additionally argues the Commission should have addressed the "overlapping" jurisdiction of the Public Utilities Commission ("PUC").

While thorough in many respects, the Commission's final decision still does not evince the "level of openness, diligence, and foresight" that is required where vital public trust resources like water are at stake. See In re Water Use Permit Apps. (Waiāhole I), 94 Hawai'i 97, 143, 9 P.3d 409, 455 (2000). In summary, with respect to the IIFS, we hold the Commission failed to justify its decision to not restore water to the streams in light of the closure of the last Maui sugar plantation and newly incorporated downstream uses. The final decision also lacks reasonable clarity with respect to whether all downstream uses were incorporated into the IIFS. Further, the Commission's final decision lacks findings on the effect of its decision on instream traditional and customary Native Hawaiian rights protected by the Hawai'i Constitution and the

feasibility of protecting those rights, as required by Ka Pa'akai O Ka 'Āina v. Land Use Commission, 94 Hawai'i 31, 7 P.3d 1068 (2000).

The Commission's final decision also unlawfully delegates the agency's public trust duties to balance between users during times of water shortages to WWC and, to a lesser extent, Mahi Pono. The Commission's final decision also does not make reasonably clear the process by which it arrived at Mahi Pono's water allocation.

We therefore vacate the Commission's Findings of Fact, Conclusions of Law, and Decision and Order issued June 28, 2021, as amended by Errata issued June 30, 2021, with respect to the IIFS and the delegation of the Commission's public trust duties. Other than for the reasons given in this opinion for vacatur or remand, we affirm. We remand for further proceedings consistent with this opinion.

## II.  Background

### A.  Nā Wai 'Ehā, "the four great Waters of Maui"

Nā Wai 'Ehā, or "the four great Waters of Maui," encompasses Waihe'e River, Waiehu Stream (North and South), Wailuku River (formerly 'Īao Stream), and Waikapū Stream and the surrounding

ahupua'a (watershed)[1] on the windward side of Mauna Kahālāwai, the West Maui Mountains.

### 1.   Significance in Hawaiian history and culture

"Due to the profusion of fresh-flowing water in ancient times," Nā Wai 'Ehā is central in Hawaiian history and culture, and historically "supported one of the largest populations and was considered the most abundant area on Maui."  According to undisputed FOFs, Kānaka Maoli (Native Hawaiians)[2] revered Nā Wai 'Ehā as the site of heiau (places of worship) and the traditional and customary practice of hiding piko (the naval cord of newborn babies), representing connection to the land.  Other traditional and customary practices "thrived in Nā Wai 'Ehā, including the gathering of upland resources, such as thatch and tī, and protein sources from streams," including 'o'opu (goby), 'ōpae

---

[1]    An ahupua'a is defined as a "[l]and division usually extending from the uplands to the sea."  Mary K. Pukui & Samuel H. Elbert, Hawaiian Dictionary 9 (1986).  "The Hawaiian equivalent of a watershed is the ahupua'a."  What is a watershed?, Hawaiian Association of Watershed Partnerships, https://hawp.org/what-is-a-watershed/#:~:text=The%20Hawaiian%20equivalent%20of%20a,to%20more%20than%2010 0%2C000%20acres (June 30, 2023) [perma.cc/C8KP-QUW6]

[2]    Where quoted language in this opinion uses the lowercase "native Hawaiian," we clarify those references also encompass all Native Hawaiians, which refers to descendants of the Indigenous peoples who inhabited the Hawaiian Islands prior to 1778, regardless of blood quantum.  See Flores-Case 'Ohana v. Univ. of Haw., 153 Hawai'i 76, 82 n.10, 526 P.3d 601, 607 n.10 (2023).

(shrimp), and hīhīwai (snail).[3]  The abundance of water also "enabled extensive loʻi kalo (wetland kalo) complexes"; Nā Wai ʻEhā "comprised the largest continuous area of wetland taro cultivation in the islands."

Today, Native Hawaiian practitioners continue to exercise traditional and customary rights in Nā Wai ʻEhā.  The exercise of these rights, however, is impacted by offstream diversions, which are largely for private commercial use.  During the sugarcane plantation era, "big five" companies C. Brewer and Alexander & Baldwin ("A&B") began building ditch systems to divert water from Nā Wai ʻEhā streams for irrigation of two sugar plantations, Wailuku Sugar and HC&S (owned by C. Brewer and A&B, respectively).  Wailuku Sugar ceased sugar operations in the 1980s and became WWC in 2005, formed to "own and operate the agricultural water systems" previously run by the sugar companies.  According to community testimony before the Commission, restoration of Nā Wai ʻEhā mauka to makai[4] stream flow is "critical to the perpetuation and practice of Hawaiian culture."

---

[3]  ʻOʻopu is the "name for fishes included in the families Eleotridae, Gobiidae, and Blennidae."  Pukui & Elbert, supra note 1 at 290.  Ōʻpae are shrimp.  Id. at 291.  Hīhīwai are endemic "grainy snail," shellfish, or "pelagic grapsid crab."  Id. at 68.

[4]  "Mauka and makai are Hawaiian words meaning toward the mountain and toward the ocean, respectively."  Paul F. Nahoa Lucas, A Dictionary of Hawaiian Legal Land-terms 76 (1995).

    **2.**    **Water systems and stream flow data**

A United States Geological Survey ("USGS") shows 1984–2005 data on the Nā Wai 'Ehā water systems. It summarizes Nā Wai 'Ehā stream flows through flow-duration curves measured by $Q_x$.[5] According to the study, the streams' mean base flow, or the amount of ground water discharge sustained in the streams between precipitation events, is generally between the $Q_{60}$ and $Q_{80}$ range. Because Nā Wai 'Ehā's ground and surface waters[6] are interconnected, its base flows vary based on ground water levels. The USGS concluded the $Q_{70}$ discharge could generally "be an appropriate estimate of mean base flow" for Hawai'i streams. The median flow, on the other hand, is at $Q_{50}$ and, according to the Commission, is "reflective of typical flow conditions."

---

[5]    Flow-duration curves show "the percentage of time that specified stream flows were equaled or exceeded during a given period of record." According to the Commission, the subscript in $Q_x$ is the percentage of time at which the flow was measured. For example, the maximum amount of water measured in a stream during a given time period is the $Q_1$ flow, or the amount of flow equaled or exceeded 1% of the time.

[6]    The Water Code defines "ground water" as "any water found beneath the surface of the earth, whether in perched supply, dike-confined, flowing, or percolating in underground channels or streams, under artesian pressure or not, or otherwise." Hawai'i Revised Statutes ("HRS") § 174C-3 (2011). It defines "surface water" as

> both contained surface water — that is, water upon the surface of the earth in bounds created naturally or artificially including, but not limited to, streams, other watercourses, lakes, reservoirs, and coastal waters subject to state jurisdiction — and diffused surface water — that is, water occurring upon the surface of the ground other than in contained water bodies. Water from natural springs is surface water when it exits from the spring onto the earth's surface.

Id.

We summarized the USGS study's findings regarding the surface waters of Nā Wai ʻEhā in a previous case involving Nā Wai ʻEhā IIFS and ground waters:

> The Waiheʻe River is the principal water source in Nā Wai ʻEhā; it is about 26,585 feet long, and its watershed covers 4,500 acres. From 1984–2005, [USGS] data shows streamflow upstream of all diversions as follows: the Q50 flow was 34 [million gallons per day, or mgd], the Q70 flow was 29 mgd, the Q90 flow was 24 mgd, and the Q100 flow was 14 mgd. . . .
>
> The Waiehu Stream is formed by the confluence of North and South Waiehu Streams; it is about 23,700 feet long, and its watershed covers about 6,600 acres. Gaging stations on both branches of the Waiehu Stream were discontinued in 1917, but USGS used historical data and record-extension techniques to estimate flows above all diversions for North Waiehu Stream from 1984–2005 as follows: the Q50 flow was between 3.1 to 3.6 mgd, the Q70 flow was between 2.3 to 2.7 mgd, the Q90 flow was between 1.4 to 2.7 mgd, and the Q100 flow was 1.6 mgd (as measured in March 1915). For South Waiehu Stream, USGS utilized the same record extension techniques, and estimated the 1984–2005 flows as follows: the Q50 flow was between 2.4 to 4.2 mgd, the Q70 flow was between 1.9 to 2.8 mgd, the Q90 flow was between 1.3 to 2.0 mgd, and the Q100 flow was 1.5 mgd (recorded in July 1913). . . .
>
> ʻĪao Stream [(now Wailuku River)] is the second-largest stream in Nā Wai ʻEhā; it is about 38,000 feet long, and its watershed covers about 14,500 acres. USGS calculated the 1984–2005 flows above all diversions as follows: the Q50 flow was 25 mgd, the Q70 flow was 18 mgd, the Q90 flow was 13 mgd, and the Q100 flow was 7.1 mgd. . . .
>
> The Waikapū Stream is the southern-most stream and the longest of the four streams; it is about 63,500 feet in length, with a watershed of about 9,000 acres. USGS, using record extension techniques, estimated the 1984–2005 flows above all diversions as follows: the Q50 flow was between 4.8 to 6.3 mgd, the Q70 flow was between 3.9 to 5.2 mgd, and the Q90 flow was between 3.3 to 4.6 mgd. The lowest recorded flow for Waikapū Stream was 3.3 mgd, in October 1912. . . .

In re ʻĪao Ground Water Mgmt. Area High-Level Source Water User Permit Apps. (Nā Wai ʻEhā I), 128 Hawaiʻi 228, 232-33, 287 P.3d 129, 133-34 (2012) (emphases added) (footnotes omitted); see also 128 Hawaiʻi at 252-53, 287 P.3d at 153-54 (holding the Commission did not err in utilizing the USGS figures as a starting point for its IIFS analysis).

Water diverted from Nā Wai ʻEhā is distributed through two primary and two secondary systems. The primary distribution systems are the WWC (previously Wailuku Sugar) ditch system and Mahi Pono (previously HC&S) reservoir/ditch system. As of the issuance of the D&O II, the Commission found that the primary distribution systems receive water via seven active diversions: two on Waiheʻe River, one on South Waiehu Stream, two on Wailuku River, and two on Waikapū Stream (historically, there were five additional diversions). The secondary distribution systems are the "kuleana"[7] ditches/pipes[8] that either have an intake directly in a stream or receive water from the primary systems.

---

[7] The term "kuleana" as used here and by the parties describes the "distribution system and users who were not charged for water delivery." See Nā Wai ʻEhā I, 128 Hawaiʻi at 234 n.7, 287 P.3d at 135 n.7. The Hui/MTF and OHA equate kuleana rights to appurtenant rights and explain that "[s]uch rights are not a strictly a Native Hawaiian right, although in this case many of the kuleana rightholders are Native Hawaiian."

[8] WWC replaced many ditches with pipes in the 1980s to make its water delivery system "more reliable and consistent."

**B.    Adoption of the Water Code and 1988 IIFS**

In 1987, the Hawaiʻi legislature adopted the Water Code, located in HRS chapter 174C.  Pursuant to that chapter, in 1988, the Commission adopted administrative rules including the first IIFS for Nā Wai ʻEhā.  See HRS § 174C-8 (2011) ("The commission shall adopt and enforce such rules as may be necessary or convenient to administer this chapter.").  Hawaiʻi Administrative Rules ("HAR") § 13-169-48 (eff. 1988)[9] set the initial IIFS for Nā Wai ʻEhā at the amount of water flowing in each stream on its effective date, as naturally varying but without new diversions.  The 1988 IIFS effectively permitted all then-existing diversions, regardless of stream conditions.

---

[9]    HAR § 13-169-48 provided that

> The Interim Instream Flow Standard for all streams on West Maui, as adopted by the commission on water resource management on October 19, 1988, shall be that amount of water flowing in each stream on the effective date of this standard, and as that flow may naturally vary throughout the year and from year to year without further amounts of water being diverted offstream through new or expanded diversions, and under the stream conditions existing on the effective date of the standard, except as may be modified by the following conditions:
>
> > (1) Based upon additional information or a compelling public need, a person may petition the commission on water resource management to amend the standard to allow future diversion, restoration, or other utilization of any streamflow.
> >
> > (2) The commission reserves its authority to modify the standard or establish new standards, including area-wide or stream-by-stream standards, based upon supplemental or additional information. . . .

(Emphasis added.)

## C.    First contested case agency proceedings

In 2003, the Commission designated the 'Īao Aquifer as a Ground Water Management Area subject to ground water use permitting.  In 2004, the Hui/MTF filed a petition to amend the IIFS for Nā Wai 'Ehā pursuant to HRS § 174C-71(2)(A) (2011), which provides, "Any person with the proper standing may petition the commission to adopt an interim instream flow standard for streams in order to protect the public interest pending the establishment of a permanent instream flow standard."  The Commission consolidated the proceedings and held a contested case hearing over twenty-three days in 2007 and 2008.

In 2010, the Commission issued its first Findings of Fact, Conclusions of Law, and Decision and Order ("D&O I"), with Hearings Officer Dr. Lawrence H. Miike ("Miike") dissenting.[10] Nā Wai 'Ehā I,128 Hawai'i at 236-37, 287 P.3d at 137-38.  The D&O I IIFS restored a total of 12.5 mgd of stream flow, but only to

---

[10]    Miike's 2009 proposed findings of fact, conclusions of law, and decision and order had proposed restoring a total of 34.5 mgd among the four streams:

> the IIFS for the Waihe'e River would be 14 mgd downstream of diversions; for North and South Waiehu Streams, the IIFS would be 2.2 mgd and 1.3 mgd, respectively; for 'Īao Stream, the IIFS would be 13 mgd; and for Waikapū Stream, the IIFS would be 4 mgd, with contingencies to adjust the IIFS or its point of measurement.

Nā Wai 'Ehā I, 128 Hawai'i at 235, 287 P.3d at 136.

Waiheʻe River and Waiehu Stream.[11]  Id.  The D&O I "maintained the status quo" as to Wailuku River (then ʻĪao Stream) and Waikapū Stream.  128 Hawaiʻi at 237, 287 P.3d at 138.

D.   **Nā Wai ʻEhā I**

On appeal, this court vacated the Commission's D&O I and remanded for further proceedings.  Nā Wai ʻEhā I, 128 Hawaiʻi at 262, 287 P.3d at 163.  We held in part that the Commission (1) failed to enter FOFs and COLs regarding the effect of its amended IIFS on traditional and customary Native Hawaiian rights and the feasibility of protecting those rights pursuant to Ka Paʻakai, 94 Hawaiʻi 31, 7 P.3d 1068; (2) did not adequately justify its decision to not restore streamflow to two of the streams because it failed to consider the effects on instream uses other than amphidromous species; and (3) erred in its treatment of diverters' system losses and alternative water sources in granting water use permits.  Nā Wai ʻEhā I, 128 Hawaiʻi at 245-51, 256-62, 287 P.3d at 146-52, 157-63.

E.   **2014 settlement on remand**

On remand, the parties reached a settlement, which was approved by the Commission by order dated April 17, 2014 ("2014 agreement").  In relevant part, the 2014 agreement set the IIFS at 10 mgd for Waiheʻe River; 1.0 mgd for North Waiehu Stream

---

[11]    The D&O I set the IIFS at 10 mgd for Waiheʻe River, 1.6 mgd for North Waiehu Stream, and 0.9 mgd for South Waiehu Stream.  Id.

above the Waihe'e Ditch; for Wailuku River, 10 mgd below the WWC diversion with low flow adjustments and 5 mgd at the stream mouth; and 2.9 mgd for Waikapū Stream below the South Waikapū Ditch.[12]

F.   **Second contested case agency proceedings**

In 2008, while Nā Wai 'Ehā I was pending, the Commission designated Nā Wai 'Ehā as a SWMA in response to a petition by the Hui/MTF.  As a result, existing and new water users were required to apply for SWUPs pursuant to HRS § 174C-48(a) (2011), which provides in part, "No person shall make any withdrawal, diversion, impoundment, or consumptive use of water in any designated water management area without first obtaining a permit from the commission."  Over 140 applicants filed SWUPAs, including appellant MMK, cross-appellant WWC, and cross-appellant Mahi Pono's predecessor, HC&S.

On December 31, 2014, the Commission issued a provisional ruling on whether particular parcels had valid claims for appurtenant rights.

In January 2016, A&B announced closure of operations of the last sugar plantation on Maui, HC&S, and a planned shift to diversified agriculture.  In light of that closure, the Hui/MTF

_____

[12]   It appears no IIFS was set for the South Waiehu Stream, but the parties stipulated that the kuleana intake from the South Waiehu diversion would receive 0.25 mgd during low stream flows, and the remainder of the water would be returned to the streams.

filed a petition to increase Nā Wai 'Ehā's IIFS. The Commission consolidated the SWUPA and IIFS proceedings.

Miike held a contested case hearing over eleven days between July 11, 2016, and October 14, 2016. MMK, WWC, the Hui/MTF, OHA, and HC&S all participated. The contested case hearing included testimony from community members praising the benefits of the 2010 and 2014 stream flow restorations.

### 1. Parties' proposed decisions

Following the contested case hearing, various parties submitted proposed FOFs, COLs, and decision and orders. The Hui/MTF and OHA proposed IIFS totaling approximately 37.7 mgd[13] with provisions for low flow modifications.

In MMK's existing use application (SWUPA 2186), MMK had represented it owns and operates two golf courses in the area: (1) the King Kamehameha Golf Course, a private membership course located in Waikapū, Maui, and (2) the Kalihi Golf Course, a public course located in Wailuku, Maui. MMK proposed the Commission grant it a SWUP for 1.25 mgd[14] to continue operation of its golf courses. That figure was based on a proposed finding that its allocation should be based on the approximate

---

[13]    That proposal distributed an IIFS of 18 mgd to Waihe'e River, 13 mgd to Wailuku River, 1.3 mgd to South Waiehu Stream, 1.5 mgd to North Waiehu Stream, and 3.9 mgd to Waikapū Stream.

[14]    MMK represented this figure was reduced from the 1.29 mgd it originally requested in its 2009 SWUPA, "[b]ased on updated figures from water meter readings."

15

midpoint between its actual historical average water use from 2006 through 2015, which it calculated as 1.037 mgd, and the driest month average, which it calculated as 1.53 mgd.

Next, HC&S proposed in relevant part that the Commission allocate it 17.33 mgd for agricultural irrigation of the Waiheʻe-Hopoi fields.  That figure represented a significant decrease from its initial SWUPA request of 36.29 mgd (SWUPA 2206), resulting from HC&S's planned shift from sugar to other types of agriculture, including the cultivation of bioenergy crops.

Finally, in WWC's existing use application (SWUPA 2157), WWC had represented it operates the Nā Wai ʻEhā ditch system, and that it effectuates water deliveries to agricultural, industrial, commercial, and domestic water users.  WWC had requested a permit for system losses from evaporation, seepage, and operational requirements of the delivery system.   WWC proposed the Commission grant it a SWUP for system losses in an amount "equal to 4.97%" of the total water it diverted from the streams for distribution.  WWC did not specify a numerical amount requested at this juncture.[15]  However, WWC apparently

---

[15]     During the contested case hearing, Avery Chumbley, President of WWC, testified,

> I would note just for clarification that in our [SWUPA] we asked for 3,174,000 gallons in system losses, but what we're asking here to do now is to issue us a permit for our system losses based on the flows that go through the diversions, because we've put more water back into the
> (continued. . .)

calculated its initially requested losses of 7.34% of "total diversions" as 4.04 mgd[16] based on 7.34% of the <u>total mean stream flows</u> at 55 mgd (55 mgd x 7.34% = 4.037 mgd) (rather than the amount <u>diverted</u>).

## 2. Hearings Officer Miike's proposed D&O

On November 1, 2017, Miike issued his proposed D&O.  Miike recommended IIFS totaling 28.8 mgd, with adjustments for low-flow conditions, distributed as follows:  14 mgd for Waiheʻe River, 1.0 mgd for North Waiehu Stream, 0.9 mgd for South Waiehu Stream, 10 mgd for Wailuku River, and 2.9 mgd for Waikapū Stream.  Miike thus recommended an increase of 4 mgd[17] for Waiheʻe River's IIFS from the 2014 agreement; he recommended the other IIFS remain as set in the 2014 agreement.

---

streams, so there's less flow going through our ditches. And depending on what permits you issue, will determine the system losses that we will realize.

[16]    Based on its average use from May 2007 to April 2008, and after subtracting alternative water sources, WWC had initially requested a total of 3,174,000 gpd.  WWC's proposal included findings that it had since reduced its system losses by repairing structures, removing reservoirs, and removing the North Waiehu ditch from service.

[17]    Miike's proposed increase for Waiheʻe River was based on his conclusions that the 2010 IIFS amendment

resulted in an increase of natural habitat units from less than 1% to 11.1%, and the revival of springs seeps, and wetlands.  However, the amended IIFS of 10 mgd was less than the lowest flow recorded of 14 mgd, and though increasing the flow will not have proportionate increase in habitat units, a 40 percent increase from 10 mgd to 14 mgd should nevertheless have a measurable impact in increasing natural habitat units higher than the current 11.1%.

As to the SWUPAs, Miike recommended issuing (1) MMK an existing use permit for 1.037 mgd on a 12-MAV monitoring standard; (2) HC&S an existing use permit for 15.65 mgd (13.5 mgd for 3,650 acres of the Waiheʻe-Hopoi Fields and 2.15 mgd in system losses, accounting for an offset in alternative water sources of 0.1 mgd from the ʻĪao Tunnel and 3 mgd from Well 7); and (3) WWC a permit for system losses of 2.73 mgd, "or approximately 4.97% of water diverted for delivery to authorized users."

MMK, WWC, the Hui/MTF, and OHA filed exceptions to Miike's proposed D&O.  HC&S did not.

### 3.    Substitution of Mahi Pono for HC&S

Over a year later, on May 14, 2019, HC&S and Mahi Pono jointly moved to withdraw HC&S and substitute Mahi Pono as the applicant for SWUPA 2206, pursuant to HAR § 13-167-30 (eff. 1988).  That regulation allows the Commission to substitute parties "for good cause shown."  Id.  HC&S and Mahi Pono declared good cause existed because HC&S transferred its interest[18] in the Waiheʻe-Hopoi Fields to Mahi Pono, and Mahi Pono intended to use the land for agricultural purposes.

---

[18]    At the hearing on the substitution motion, Mahi Pono's counsel explained that "Mahi Pono bought all of the land that is covered by [SWUPA 2206] with the exception of one parcel . . . approximately 21 acres," which was retained by HC&S.

18

The majority of parties responding to the substitution motion took no position.  The Hui/MTF urged the Commission to avoid and minimize any further delays in concluding the contested case hearing.

Mahi Pono then asked the Commission to postpone the hearing on the substitution motion for three months so that the parties could reach a settlement as to Mahi Pono's water allocation in order to "avoid re-opening this proceeding."  MMK, the Hui/MTF, and OHA opposed any delay of the proceedings and argued Mahi Pono had stepped into the shoes of HC&S.[19]

At the hearing on the substitution motion, Mahi Pono's counsel stated that the Commission would need to hear about Mahi Pono's water needs, proposed crops, water budget for each crop, and planting schedules, etc., in order to render a decision, which would necessitate reopening the evidentiary portion of the contested case hearing.  In order to avoid reopening the evidentiary portion of the contested case hearing, counsel proposed allowing Mahi Pono and all of the parties two to three months to settle on Mahi Pono's water allocation.  Counsel asserted that if a settlement was not possible, Mahi Pono "would be back before th[e] commission requesting that the contested case be reopened."

---

[19]    OHA also noted that, once SWUPA 2206 was issued, HC&S could instead transfer the permit to Mahi Pono, pursuant to HRS § 174C-59 (2011).

OHA pointed out that HC&S had waived any exceptions to the proposed D&O.  The proposed D&O and HC&S's waiver were part of the contested case hearing records at the time Mahi Pono purchased the Waihe'e-Hopoi Fields from HC&S.  OHA maintained that Mahi Pono stepped into the shoes of HC&S and the record it had created.

The Commission granted the substitution motion.

### 4.   Proposed stipulation by Mahi Pono, the Hui/MTF, and OHA

Mahi Pono, the Hui/MTF, and OHA thereafter entered into a "Stipulation Regarding SWUPA 2206" and intended for the stipulation "to be a binding and enforceable settlement and resolution of any disputes regarding SWUPA 2206."  The parties agreed that Mahi Pono's total allocation would be 11.22 mgd. Mahi Pono would receive an initial allocation of 9.35 mgd.  That figure was derived by multiplying the total plantable acreage of 3,740 by "the standard water duty" of 2,500 gallons of water per acre per day ("gad") "for efficient diversified agricultural operations."  The stipulation also provided for an additional 1.87 mgd if Mahi Pono agreed to certain other conditions.[20] Counsel for Mahi Pono, the Hui/MTF, and OHA signed; no other

---

[20]   Those included planting 1,850 acres of crops by December 31, 2021; developing a remediation plan to minimize system losses; and reaching and maintaining a running annual average use of 4.5 mgd from Well 7.

permit applicants did.  The Commissioners also did not sign the stipulation.

At oral argument on the parties' exceptions, Mahi Pono provided a statement to the Commission about the parties' proposed stipulation.  The Commissioners "applaud[ed]" the agreement, characterizing it as "an excellent compromise," "[a] very positive development," and a "coming together as a community to really find ways to bridge differences in legal position as well as in actual needs."

Mahi Pono did not move to reopen the evidentiary portion of the proceedings.

### 5.   The Commission's D&O II[21]

On June 28, 2021, the Commission issued its D&O II.

#### a.   Interim instream flow standards

As to the IIFS, Commission summarized the "revival of instream values" of available habitat units in Nā Wai 'Ehā streams following the 2010 and 2014 IIFS amendments and then concluded,

> Any further increases in habitat from increasing the
> restoration flows will not result in proportionate
> increases.  The first amounts of increased flows in dry or
> very dry low-flow streams quickly result in large increases
> in wetted habitat, and the increases in wetted habitat from
> further increases in flow become less dramatic.

---

[21]    The following Commissioners presided:  Suzanne D. Case, Keith E. Kawaoka, Kamanamaikalani Beamer, Michael G. Buck, Wayne K. Katayama, and Neil Hannahs.  Commissioner Paul J. Meyer recused himself.

21

The Commission made minor amendments to the IIFS as follows. First, as to Waihe'e River, the Commission set the IIFS at 11.44 mgd. It stated this amount represented "the flow necessary to support the majority of instream habitat (10 mgd) and instream traditional and customary practices (1.44 mgd) associated with the downstream North Waihe'e 'auwai."[22] Second, the Commission set the IIFS at the "natural flow . . . without any offstream diversion"[23] for North Waiehu Stream and 0.3 mgd for South Waiehu Stream, with low flow provisions. Third, the Commission set the IIFS for Wailuku River at 10 mgd. An associated table showed an IIFS of 9.332 mgd, and 0.668 mgd for "Instream Public Trust Use." Fourth, for Waikapū Stream, the Commission expressly retained the IIFS of 2.9 mgd from the D&O I and 2014 agreement, with low flow modifications.

For each stream except Waiehu, the Commission also provided related tables, which it stated, "set forth projected allocations for when stream flows will not sustain the IIFS and all permitted amounts." The Commission explained,

> Decreases in permitted amounts will be made to the lowest priority uses first. When the only remaining uses are all of the same priority, then the IIFS and all of the remaining uses will be decreased in equal proportion so that all uses may continue. The Commission may make

---

[22] 'Auwai are irrigation ditches. Pukui & Elbert, supra note 1 at 33. The Commission uses the term "'auwais" to refer to water diversions for kuleana use.

[23] The Hui/MTF and OHA represent that the "natural flow" for North Waiehu stream is the $Q_{50}$ flow of 3.2 mgd.

22

> changes to these allocations depending on specific
> circumstances as situations may require.

The tables showed the IIFS and allocations at various levels of stream flows for broad categories such as "Instream Public Trust Uses," "System Loss," "Available for Off-Stream Use," "Permitted Off-Stream Public Trust Uses," "Permitted Off-Stream Reasonable and Beneficial Uses," and "Remaining Stream Flow."[24]

In addition to the tables providing for low flow adjustments, the D&O II provided that "[t]he flows established below the diversions shall be augmented by the amounts necessary to meet the requirements of downstream water-use permittees and domestic users."

The D&O II also contains several provisions concerning WWC's and Mahi Pono's responsibilities with respect to the IIFS. For example, it provides that "WWC and Mahi Pono will work with Commission staff to implement the IIFS and modifications to the previous conditions that have been rescinded." It also explains that "the IIFS for Waihe'e River, Waiehu Stream, and Wailuku River are intended to result in mauka to makai stream flows."

> Thus, sufficient flows must be added for permittees
> and domestic users downstream of the IIFS locations. This
> will be a particularly difficult task with IIFS located
> where there are also substantial numbers of upstream as
> well as downstream permittees and domestic users, because
> WWC and to a lesser extent, Mahi Pono, must maintain a

---

[24] Footnotes in the D&O II clarify that the instream public trust uses listed in the tables include water for existing and new lo'i kalo and domestic use that is conveyed through the ditch system.

<u>balance between upstream and downstream users while meeting the IIFS for instream purposes</u>. Moreover, when stream flows are insufficient to meet the permitted amounts, <u>WWC and Mahi Pono must reduce available water for downstream permittees at identified delivery points equitably according to the permittees' priority</u>.

(Emphasis added.)

### b. Surface water use permits

The D&O II then addressed the parties' SWUPAs. The Commission set forth the following non-absolute priorities amongst water uses, to guide its allocations:

> a. Native Hawaiian traditional and customary practices and domestic uses of the general public ([Maui Department of Water Supply's ("MDWS")] public water system).
> b. Appurtenant rights[25] that are, or will in the near future, be exercised.
> c. Existing uses.
> d. New uses.

The Commission granted permits to numerous applicants with appurtenant rights, loʻi kalo users, and other existing and new users.

In its COLs, the Commission set the water duty at 2,500 gad for agriculture across the board, "for both large- and small-

---

[25] "Appurtenant water rights are rights to the use of the quantity of water utilized by parcels of land at the time of its original conversion into fee simple." <u>Robinson v. Ariyoshi</u>, 65 Haw. 641, 645 n.2, 658 P.2d 287, 293 n.2 (1982) (citing <u>Peck v. Bailey</u>, 8 Haw. 658, 661 (Haw. Kingdom 1867)).

> It is the general law of this jurisdiction that when land allotted by the Māhele was confirmed to the awardee by the Land Commission and/or when Royal Patent was issued based on such award, such conveyance of the parcel of land carried with it the appurtenant right to water for taro growing.

<u>McBryde Sugar Co., Ltd. v. Robinson</u>, 54 Haw. 174, 188, 504 P.2d 1330, 1339 (1973).

scale agriculture for all types of crops, including nurseries, orchards, and golf courses." The Commission concluded that the contested case hearing revealed "no obvious differences between large- and small-scale farming, nor between types of crops. The least amounts . . . are 300-400 gad for fruit trees, and the highest amounts are 4,000-18,000 gad for mixed uses, with the last amount, 18,000 gad, a clear outlier." The Commission further concluded,

> Applicants seeking lesser amounts will not have their permits increased to the maximum requirement of 2,500 gad, and applicants seeking larger amounts will be permitted at the maximum of 2,500 gad, except when larger requests are justified. Standards . . . for specific crops will not be accepted in lieu of specific justifications for amounts larger than 2,500 gad, because they have been shown to generally over-estimate irrigation requirements.

With respect to MMK's SWUPA (SWUPA 2186), the Commission entered the following findings. MMK's two golf courses encompass approximately 350 acres, on which water delivered by WWC is used to irrigate 302 acres of Bermuda grass and three acres of other landscape. MMK's final request for 1.25 mgd was equivalent to 4,098 gad. From June 2006 to December 2015, WWC used an average of 1.037 mgd. MMK believed that 1.037 mgd was indicative of the average use it may see over the next ten years, but that amount would not meet the needs of the golf courses in drier months, and the driest month in each year averaged 1.53 mgd. Thus, MMK's request of 1.25 mgd was based on the approximate mid-point between the 1.037 mgd historical

25

average and the driest month average of 1.53 mgd.  Without sufficient water at the time water is needed, MMK would not be able to adequately maintain the turf grass; at the same time, MMK would not benefit from using more water than needed.  MMK has a contract with WWC in which it paid approximately four million dollars "for the perpetual delivery of up to 2.7 mgd."  The Commission also entered findings on MMK's steps to mitigate water use and alternative water sources.

The Commission concluded that neither MMK's permit request for 1.25 mgd, nor MMK's lowest use of 1.037 mgd, was "reasonable-beneficial."  In that regard, the Commission concluded,

> MMK's request for a permit for 1.25 mgd, based in part on dry years as well as average years, is similar to requesting priority water during periods of water shortage over other permittees in advance . . . or to being granted a water reservation, for which rulemaking is required . . . .  Such a request is not a reasonable-beneficial use.

As to MMK's "lowest use of 1.037 mgd," the Commission noted that it equated to "3,400 gad."  The Commission concluded this amount, too, was not "reasonable-beneficial," for "[t]here is no reason to differentiate and give a higher water duty to a recreational use than to diversified agriculture."  The Commission stated it would recognize "MMK's use of 305 acres for turf and miscellaneous landscaping at the same duty as diversified agriculture," which was allocated 2,500 gad.  The Commission thus issued an existing use permit to MMK for 762,500

26

gallons of water per day ("gpd"), calculated based on 305 acres of land at a water duty of 2,500 gad (305 acres x 2,500 gad = 762,500 gpd).

Next, the Commission entered findings concerning SWUPA 2206. The Commission traced the history of SWUPA 2206. In a footnote, the Commission acknowledged that HC&S withdrew from the contested case hearing and Mahi Pono was substituted in as the SWUPA 2206 applicant. The Commission continued, "It is assumed that HC&S's projected future uses remain the same for Mahi Pono." In sub-FOF 480(j), the Commission erroneously stated, "Mahi Pono plans to have a mix of bioenergy crops that will be rotated over the course of a few seasons." The Commission then allocated 16.60 mgd to Mahi Pono for 3,650 acres of the Waiheʻe-Hopoi Fields. Later in the D&O II, however, the Commission mentioned diversified agriculture, albeit in a finding concerning Well No. 7: "Well No. 7 cannot be viewed as a practicable alternative source during the period of transition from sugar to diversified agriculture."

The Commission concluded Mahi Pono's total irrigation requirement was 16.60 mgd, and its system losses were 2.15 mgd. The Commission also concluded Mahi Pono's alternative water sources were .1 mgd from the ʻĪao Tunnel and 3 mgd from Well No. 7. The Commission then issued Mahi Pono an existing use permit for 15.65 mgd, "which consist[ed] of 13.5 mgd for irrigation of

3,650 acres of the Waiheʻe-Hopoi Fields (3,650 acres x 2,500 gpd = 9,125,000 gpd)[26] and 2.15 mgd in system losses."  Mahi Pono's permit was subject to special conditions, including the following:

> Although Mahi Pono is permitted 13.5 mgd of surface waters to irrigate its Waiheʻe-Hopoi Fields, when Mahi Pono's use of surface water reaches half of its permitted amount, or approximately 7 mgd, it will be required to use Well No. 7 to the point that the brackish well water becomes unusable for irrigation.

Finally, FOF 332 addressed WWC's SWUPA, SWUPA 2157.  The Commission found WWC's system losses of 4.97% were less than the maximum recommended system losses of 10% under national standards provided by the USDA Soil and Conservation Service and American Water Works Association, and less than typical system losses for open distribution systems of 10 to 15 percent, according to MDWS's testimony.  The Commission then found that 4.97% equals system losses of 2.73 mgd.[27]

Hence, the Commission issued to WWC "an existing use permit for system losses of 2.73 mgd, or approximately 4.97% of water diverted for delivery to authorized users."  The D&O II did not indicate what figure the Commission multiplied by 4.97% to reach

---

[26]  The 13.5 mgd amount erroneously did not match the Commission's calculated figure of 9,125,000 gpd; as explained below, the Commission subsequently issued an errata.

[27]  Also, COL 140 stated that if WWC ceased operations, "except for Mahi Pono's direct management of parts of the Spreckels Ditch, all other users, MDWS, kuleana, and private, would not have access to water."

the 2.73 mgd figure.  As conditions of the permit, the Commission required WWC to "gauge and continuously monitor" water levels at specified locations and conduct an annual water audit of its system.  The Commission also mandated that WWC ensure specified quantities of water are delivered to specified distribution points, "find a way to provide water from the Waihe'e Ditch for previous kuleana users of the North Waiehu Ditch," and submit applications for the abandonment of specified inactive stream intakes.  In a separate paragraph, the Commission again directed WWC to "provide water from the Waihe'e Ditch for previous kuleana users of the North Waiehu Ditch."

The D&O II also listed conditions applicable to all SWUPs, including that "[a]s required by HAR § 13-171-42(c), the permittee shall submit a water shortage plan outlining how it will reduce its water use in case the Commission declares a water shortage."

### 6.    Errata to the D&O II

Two days after it issued the D&O II, on June 30, 2021, the Commission sua sponte issued an errata.  The errata amended the D&O II's conclusions concerning SWUPA 2206 to conclude that Mahi Pono's total irrigation requirement was 9.125 mgd (instead of 16.60 mgd).  It also concluded that Mahi Pono's claimed system losses of 2.15 mgd were "excessive and unsubstantiated," allowing instead amended system losses of 456,250 gpd.  The

29

Commission then amended the amount of water Well No. 7 could provide, concluding that the well was an alternative source of 4.5 mgd (instead of 3 mgd) for the Waihe'e-Hopoi Fields. The Commission added a new sub-section that states, "Mahi Pono is expected to contribute at a minimum approximately half of its primary irrigation need from Well No. 7."

With these new figures, the Commission issued Mahi Pono an amended existing use permit for 4.98125 mgd (instead of 15.65 mgd), which was "determined by adding 9.125 mgd for irrigation of 3,650 acres of the Waihe'e-Hopoi Fields (3,650 [acres] x 2,500 gpd = 9,125,000 gpd), 456,250 gpd in system losses minus 0.1 mgd from Mahi Pono's 'Īao Tunnel and 4.5 mgd from Well No. 7." The Commission also deleted the provision requiring Mahi Pono to use Well No. 7 once it uses half of its permitted amount of surface water.

Nothing in the D&O II or errata mentioned the Hui/MTF, OHA, and Mahi Pono's proposed stipulation.

### 7. Motions for reconsideration

MMK filed a motion for clarification or partial reconsideration, requesting the Commission clarify that MMK's SWUP was to be monitored on 12-MAV.[28] The Commission denied

---

[28] Permittees monitored on a 12-MAV are able to exceed daily use allotment as long as the 12-month average does not exceed the permitted allocation.

MMK's motion in Minute Order #20 and affirmed that it "deliberately did not award any permits based on a 12-MAV in this case." It noted that

> in an area like central Maui that is subject to drought conditions during the dry months and where there are numerous users on all of the streams, neither the streams nor the other users can afford to have any permittee using more water during the dry months when everyone needs more water.
>     The Commission also notes that enforcement of the interim instream flow standards and water usage by permittees is rendered nearly impossible when any permittee is using water on a 12-MAV as it is difficult to know where in the 12 month cycle a particular user is to determine if there is a violation of their permit.

Mahi Pono also filed a motion for partial reconsideration, largely based on its stipulation with the Hui/MTF and OHA. Mahi Pono stated it had reached the stipulated water allocation of 11.22 mgd with the Hui/MTF and OHA at the "urging" of the Commission. Mahi Pono further argued that the Commission had bound it to commitments made in the stipulation without the benefit of the water allocation (11.22 mgd) agreed upon by the parties to the stipulation.

The Commission denied Mahi Pono's motion in Minute Order #21. The Commission acknowledged it had "encouraged Mahi Pono and the [Hui/MTF] to work together to arrive together at an agreement regarding Mahi Pono's water needs." And, while the Commission "commend[ed] the parties for coming together to forge the Stipulation" and expressed "hope[] that Mahi Pono w[ould] continue to stand by the commitments made in the Stipulation,"

the Commission reasoned that it had to "consider the larger picture and its trust responsibilities to balance water use amongst users, uses, and resource protection."  The Commission also stated that it was "important to treat all diversified agriculture equally, regardless of size, and to be consistent in the gallons per acre of water being allotted," which it had set at 2,500 gad.  Accordingly, the Commission explained it could not adopt the stipulation's allowance of an additional 500 gad for Mahi Pono if it met certain conditions.[29]

WWC did not file a motion for reconsideration.[30]

## G.    Appellate proceedings

MMK appealed.  The Hui/MTF, OHA, Mahi Pono, and WWC cross-appealed.[31] [32]

---

[29]    Specifically, the Commission stated it found there was "no sufficient basis for using the figure of 3,740 acres" for the Waihe'e-Hopoi fields, employed in the parties' stipulation, "instead of the 3,650 acres which the Commission has consistently recognized in its decisions since 2014."  The Commission also found unacceptable that the stipulation allowed Mahi Pono "an additional 500 gad" if it met certain agreements because "no other diversified agricultural user is allowed to increase its per acre water usage."

[30]    The Hui/MTF and OHA also filed a motion for reconsideration requesting the Commission make several changes related to appurtenant rights, which the Commission granted in part.

[31]    The Hui/MTF and OHA both filed notices of appeal, but the court clerks marked them as cross-appeals.  See Hawai'i Rules of Appellate Procedure ("HRAP") Rule 4.1(a)(1), (b)(1) (eff. 2020).

[32]    The appeals are brought pursuant to HRS §§ 269-15.5 (2020) and 91-14(a) (Supp. 2016).

1.    **MMK's appeal**

MMK raises four points of error: (1) the Commission's decision to allocate 762,500 gpd of water to MMK is clearly erroneous; (2) the Commission's classification of MMK's use as "diversified agriculture" is arbitrary, inconsistent with precedent and the Water Code, ignores evidence on MMK's actual water needs, and consists of unlawful rulemaking and/or adjudication in violation of HAPA; (3) the Commission abused its discretion in denying MMK's motion for reconsideration which requested clarification and/or reconsideration that a 12-MAV applies; and (4) the Commission violated MMK's constitutional right to due process when it designated MMK's use as "diversified agriculture" and relied on that designation to set MMK's allocation at less than its actual water needs.

The Commission, the Hui/MTF, and OHA each maintain that the Commission properly decided MMK's water allocation.  As a preliminary matter, they also argue the Commission did not classify MMK's water use for golf courses as "diversified agriculture."  In its reply briefs, MMK concedes the Commission did not classify its use as a type of "diversified agriculture," but nonetheless maintains the Commission erroneously set its use at the same water duty as diversified agriculture.

2.    **The Hui/MTF and OHA's cross-appeals**

The Hui/MTF and OHA jointly raise one point of error:  that the Commission failed to comply with its constitutional and statutory mandate to restore Nā Wai 'Ehā stream flows to the "extent practicable."  They contend this failure is evident on three levels:  the Commission's (1) decision to maintain the "status quo" IIFS from the 2014 agreement; (2) failure to justify its IIFS determinations, including by entering the requisite findings to protect Native Hawaiian rights and other instream uses to the extent practicable; and (3) failure to provide transparent and comprehensible calculations for its IIFS determinations.

The Commission argues, among other things, that it properly set the IIFS pursuant to the public trust, Water Code, and best available information, and that we should afford its IIFS decisions deference.

3.    **Mahi Pono's cross-appeal**

Mahi Pono raises three points of error:

> (1) The Commission violated Mahi Pono's right to due process when it discouraged Mahi Pono from moving to reopen the evidentiary portion of the [contested case hearing], encourag[ing] Mahi Pono to pursue a settlement agreement with the [Hui/MTF and OHA], yet, when [they] reached a [proposed stipulation], refusing to adopt said [stipulation]. . . .
>
> (2) The Commission erred in determining in the [D&O II as amended by errata] that the reasonable-beneficial water duty for diversified agriculture for Mahi Pono is 2,500 gad. . . .

34

> (3) For the reasons that the Commission erred in issuing its decision on Mahi Pono's SWUPA 2206 in the [D&O II as amended by errata], the Commission also erred by denying Mahi Pono's Recon Motion. . . .

The Hui/MTF and OHA agree with Mahi Pono that the Commission should have explained why the proposed stipulation was rejected or modified. The Hui/MTF and OHA disagree, however, with Mahi Pono's due process argument.

The Commission maintains Mahi Pono's due process rights were not violated, and that the denial of Mahi Pono's motion for partial reconsideration was justified because Mahi Pono was not entitled to a new hearing, because it was merely substituted in for HC&S, who had already been heard.

### 4. WWC's cross-appeal

WWC sets forth a number of points of error:[33] the Commission erred by (1) violating WWC's due process rights by issuing the final decision without affording WWC an opportunity to file exceptions or present argument before adopting the proposed D&O; (2) unlawfully delegating discretionary decision-making authority to WWC concerning allocation of water deliveries to permittees; (3) failing to consider WWC's status as a public utility and the jurisdiction of the PUC; and (4)

---

[33] WWC's points of error and arguments (and those in the related answering and reply briefs) have been reordered for clarity. WWC's opening brief does not comply with HRAP Rule 28(b)(4) (eff. 2016), which requires points of errors be set forth in "separately numbered paragraphs" and to state in part "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency." (Emphasis added.)

mandating that WWC (a) maintain a balance between upstream and downstream users while meeting the IIFS; (b) reduce available water for downstream permittees at identified delivery points equitably according to priority; (c) deliver water to identified users; (d) perform infrastructure improvements to its delivery system; (e) deliver water to persons who did not seek permits and/or persons who sought permits not granted; (f) deliver water in stated amounts at identified points of delivery; and (g) identify users on ditches, including ditches not operated by WWC, and report on monthly amounts of water delivered, including regarding ditches and users to which and whom WWC does not deliver water.

The Hui/MTF and OHA agree that the Commission unlawfully delegated its discretionary decision-making authority but disagree with all of WWC's other points of error. The Hui/MTF and OHA further argue Ka Pa'akai is directly applicable to the unlawful delegation point of error. The Commission disputes all of WWC's points of error.

### III. Standards of Review

**A.   Review of the Commission's decisions**

Pursuant to the Water Code, judicial review of the Commission's decisions is governed by HRS chapter 91. See HRS § 174C-12 (Supp. 2016). Trial de novo is not permitted. Id.

This court reviews direct appeals from the Commission's decisions under HRS § 91-14(g) (Supp. 2016), which states:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> > (1) In violation of constitutional or statutory provisions;
> >
> > (2) In excess of the statutory authority or jurisdiction of the agency;
> >
> > (3) Made upon unlawful procedure;
> >
> > (4) Affected by other error of law;
> >
> > (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> >
> > (6) Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

COLs "are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); [FOFs] under subsection (5); and an agency's exercise of discretion under subsection (6)." In re Water Use Permit Apps. (Waiāhole II), 105 Hawaiʻi 1, 7-8, 93 P.3d 643, 649-50 (2020) (quoting In re Hawaiian Elec. Co. (In re HECO), 81 Hawaiʻi 459, 465, 918 P.2d 561, 567 (1996)).

In other words, the Commission's FOFs are reviewable under the clearly erroneous standard. Nā Wai ʻEhā I, 128 Hawaiʻi at 238, 287 P.3d at 139 (citing In re Waiʻola O Molokaʻi, Inc., 103 Hawaiʻi 401, 421, 83 P.3d 664, 684 (2004)). Its "COLs are freely

reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law." Id.

> A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency.
> A[] FOF or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made.
> We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Id. (quoting Waiāhole I, 94 Hawaiʻi at 119, 9 P.3d at 431) (cleaned up).

We generally review the Commission's action "pursuant to the deferential abuse of discretion standard." Waiāhole II, 105 Hawaiʻi at 8, 93 P.3d at 650 (quoting Paul's Elec. Serv., Inc. v. Befitel, 104 Hawaiʻi 412, 419, 91 P.3d 494, 501 (2004)). An agency abuses its discretion when it "clearly exceeds bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." See Kolio v. Haw. Pub. Hous. Auth., 135 Hawaiʻi 267, 271, 349 P.3d 374, 378 (2015) (quoting S. Foods Grp., L.P. v. Haw. Dep't of Educ., 89 Hawaiʻi

38

443, 452, 974 P.2d 1033, 1042 (1999)).  The Commission's decision "carries a presumption of validity, and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences."  Nā Wai 'Ehā I, 128 Hawai'i at 238, 287 P.3d at 139 (quoting In re Wai'ola, 103 Hawai'i at 420, 83 P.3d at 683).

However, any deference to the Commission "presupposes that the agency has grounded its decision in reasonably clear FOFs and COLs."  In re Wai'ola, 103 Hawai'i 401, 432, 83 P.3d 664, 695 (2004).

> A court reviewing the decision of an agency should ensure that the "agency . . . make its findings reasonably clear.  The parties and the court should not be left to guess . . . the precise finding of the agency."  An agency's findings should be "sufficient to allow the reviewing court to track the steps by which the agency reached its decision."

Kauai Springs, Inc. v. Plan. Comm'n of Cnty. of Kaua'i, 133 Hawai'i 141, 164, 324 P.3d 951, 974 (2014) (first quoting Waiāhole I, 94 Hawai'i at 157, 9 P.3d at 469; and then quoting Kilauea Neighborhood Ass'n v. Land Use Comm'n, 7 Haw. App. 227, 230, 751 P.2d 1031, 1034 (1988)) (cleaned up).

B.   **State water resources trust**

Additionally, "because water is a public trust resource and the public trust is a state constitutional doctrine, this court recognizes certain qualifications to the standard of review regarding the . . . Commission's decisions."  Waiāhole II, 105

39

Hawai'i at 8, 93 P.3d at 650 (citing Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455).

> The public trust in state water resources is a constitutional doctrine, and as such, the ultimate authority to interpret and defend the public trust in Hawai'i rests with the courts of this state. This is not to say that this court will supplant its judgment for that of the legislature or agency. However, it does mean that this court will take a 'close look' at the action to determine if it complies with the public trust doctrine and it will not act merely as a rubber stamp for agency or legislative action.

Nā Wai 'Ehā I, 128 Hawai'i at 238, 287 P.3d at 139 (cleaned up) (citing Wai'ola, 103 Hawai'i at 421–22, 83 P.3d at 684–85). Hence, "[c]larity in the agency's decision is all the more essential in a case such as this where the agency performs as a public trustee and is duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute." See Waiāhole I, 94 Hawai'i at 158, 9 P.3d at 470 (cleaned up). The Commission "may compromise public rights in the resource pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state." Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455.

## C. Interpretation of the Water Code

> In construing statutes, this court has recognized that our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

40

> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....
>
> In construing an ambiguous statute, the meaning of the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool. This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning.
>
> Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.
>
> If the legislature has unambiguously spoken, the inquiry ends.
>
> When the legislative intent is less than clear, however, this court will observe the well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.
>
> The rule of judicial deference, however, does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose. Consequently, we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation.

Waiāhole II, 105 Hawai'i at 8-9, 93 P.3d at 650-51 (cleaned up).

## IV. Discussion

### A. Overview of applicable law

Our state's water law framework is firmly grounded in our constitutional protections of public trust resources and traditional and customary Native Hawaiian rights. We review that framework as the starting point for our decision.

#### 1. State water resources trust

Under the public trust doctrine, certain public resources are held in trust by the state for the benefit of the people.

41

See, e.g., Ill. Cent. R.R. Co. v. Illinois, 146 U.S. 387 (1892) (setting forth the seminal modern public trust doctrine); King v. Oahu Ry. & Land Co., 11 Haw. 717 (Haw. Terr. 1899) (endorsing the public trust doctrine for Hawaiʻi). See generally Waiāhole I, 94 Hawaiʻi at 127-30, 9 P.3d at 439-42 (summarizing the development of the public trust doctrine). In Hawaiʻi, there is a "distinct public trust encompassing all the water resources of the state." Waiāhole I, 94 Hawaiʻi at 133, 9 P.3d at 445 (citing Robinson, 65 Haw. at 674, 658 P.2d at 310).

In 1978, the people of Hawaiʻi elevated the public trust doctrine and further protections for water resources into a constitutional mandate through a constitutional amendment. See Waiāhole I, 94 Hawaiʻi at 129-30, 9 P.3d at 441-42. Article XI, Section 1 of the Hawaiʻi Constitution enshrines our state's public trust doctrine:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaiʻi's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
> All public natural resources are held in trust by the State for the benefit of the people.

Haw. Const. art. XI, § 1.

Article XI, Section 7 provides additional protections specific to Hawaiʻi's water resources:

42

> The State has an obligation to protect, control and regulate the use of Hawai'i's water resources for the benefit of its people.
>
> The legislature shall provide for a water resources agency which, as provided by law, shall set overall water conservation, quality and use policies; define beneficial and reasonable uses; protect ground and surface water resources, watersheds and natural stream environments; establish criteria for water use priorities while assuring appurtenant rights and existing correlative and riparian uses and establish procedures for regulating all uses of Hawai'i's water resources.

Haw. Const. Art. XI, § 7.

### a.    Scope and purposes of the trust

"The public trust doctrine applies to all water resources without exception or distinction." Waiāhole I, 94 Hawai'i at 133, 9 P.3d at 445.

We have recognized four types of water uses, or "purposes," protected by the state water resources trust:  (1) maintenance of waters in their natural state; (2) domestic water use, in particular, drinking water; (3) the exercise of traditional and customary Native Hawaiian water rights; and (4) the reservation of water enumerated by the Water Code.  Kauai Springs, 133 Hawai'i at 172, 324 P.3d at 982 (first citing Waiāhole I, 94 Hawai'i at 136-37, 9 P.3d at 448-50; and then citing In re Wai'ola, 103 Hawai'i at 431, 83 P.3d at 694).  We rejected, on the other hand, private commercial uses as not protected by the public trust.  Waiāhole I, 94 Hawai'i at 138, 9 P.3d at 450.  We have acknowledged the public trust "may allow grants of private interests in trust resources under certain circumstances";

43

nonetheless, it has "never been understood to safeguard rights of exclusive use for private commercial gain."  Id.

### b.  Powers and duties of the State under the trust

The "public trust is a dual concept of sovereign right and responsibility."  94 Hawai'i at 135, 9 P.3d at 447 (citing Robinson, 65 Haw. at 674, 658 P.2d at 310).

Regarding sovereign duties, the state water resources trust "embodies a dual mandate of 1) protection and 2) maximum reasonable and beneficial use."  Waiāhole I, 94 Hawai'i at 139, 9 P.3d at 451.  The "protection" mandate is the state's "duty to ensure the continued availability and existence of its water resources for present and future generations."  Id.  The state also has a "duty to promote the reasonable and beneficial use of water resources in order to maximize their social and economic benefits to the people of this state."  Id.  The object of the trust is "not maximum consumptive use, but rather the most equitable, reasonable, and beneficial allocation of state water resources, with full recognition that resource protection also constitutes 'use.'"  94 Hawai'i at 140, 9 P.3d at 452.

The state water resources trust also embodies certain "fundamental principles":

> As a first principle, the authority of the State and its political subdivisions "precludes any grant or assertion of vested rights to use water to the detriment of public trust purposes" and "empowers the state to reexamine any prior use."  Under this first principle, no person or entity has automatic vested rights to water.

44

> Second, the public trust creates an "affirmative duty" of the State and its political subdivisions "to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible."
>
> Lastly, there are no "absolute priorities" between uses under the public trust, so the state and its subdivisions must "weigh competing public and private water uses on a case-by-case basis," according to any standards applicable by law.
>
> As the public trust arises out of a constitutional mandate, the duty and authority of the state and its subdivisions to weigh competing public and private uses on a case-by-case basis is independent of statutory duties and authorities created by the legislature. "The public trust doctrine at all times forms the outer boundaries of permissible government action." Therefore, "mere compliance by agencies with their legislative authority" may not be sufficient to determine if competing uses are properly balanced in the context of uses protected by the public trust and its foundational principles.

Kauai Springs, 133 Hawai'i at 172, 324 P.3d at 982 (quoting Waiāhole I, 94 Hawai'i at 132, 141-42, 9 P.3d at 444, 453-54) (cleaned up).

In line with these principles, "any balancing between public and private purposes begins with a presumption in favor of public use, access, and enjoyment." Waiāhole I, 94 Hawai'i at 142, 9 P.3d at 454. Accordingly, the State and its agencies should employ a "higher level of scrutiny" in assessing private commercial uses. Id. "In practical terms, this means that the burden ultimately lies with those seeking or approving such uses to justify them in light of the purposes protected by the trust." Id. (citations omitted).

45

## 2.    Water Code

Pursuant to the state water resources trust, in 1987, the legislature enacted the Water Code, found in HRS chapter 174C. The public trust doctrine informs the Code's interpretation, defines its permissible "outer limits," and justifies its existence.  Waiāhole I, 94 Hawai'i at 133, 9 P.3d at 445.  The Water Code regulates all waters of the State except coastal waters.  See HRS § 174C-4(a) (2011).

Section 174C-2 of the Water Code, titled "Declaration of policy," provides,

> The state water code shall be liberally interpreted to obtain maximum beneficial use of the waters of the State for purposes such as domestic uses, aquaculture uses, irrigation and other agricultural uses, power development, and commercial and industrial uses.  However, adequate provision shall be made for the protection of traditional and customary Hawaiian rights, the protection and procreation of fish and wildlife, the maintenance of proper ecological balance and scenic beauty, and the preservation and enhancement of waters of the State for municipal uses, public recreation, public water supply, agriculture, and navigation.  Such objectives are declared to be in the public interest.

HRS § 174C-2 (2011).

Pursuant to Article XI, Section 7 of the Hawai'i Constitution, the legislature also established the Commission. See HRS § 174C-7(a) (2011).  The Commission consists of seven members with "exclusive jurisdiction and final authority in all matters relating to implementation and administration of the state water code, except as otherwise provided" in chapter 174C. Id.; see also HRS § 174C-5 (2011) ("The general administration

of the state water code shall rest with the commission on water resource management.").  The Commission is regulated by administrative rules in HAR chapter 167, adopted in 1988.

### 3.   Instream flow standards

The Commission has an "affirmative duty under the public trust to protect and promote instream trust uses." Waiāhole I, 94 Hawaiʻi at 153, 9 P.3d at 465.

Pursuant to this duty, the Water Code further mandates that the Commission "establish and administer a statewide instream use protection program."  HRS § 174C-71 (2011).  In doing so, the Commission shall:  (1) "Establish instream flow standards[34] on a stream-by-stream basis whenever necessary to protect the public interest in waters of the state;" (2) "Establish interim instream flow standards" that "shall terminate upon the establishment of a permanent instream flow standard for the stream;" (3) "Protect stream channels from alteration whenever practicable to provide for fishery, wildlife, recreational, aesthetic, scenic, and other beneficial instream uses;" and (4) "Establish an instream flow program to protect, enhance, and reestablish, where practicable, beneficial instream uses of

---

[34]   Instream flow standards are defined as "a quantity or flow of water or depth of water which is required to be present at a specific location in a stream system at certain specified times of the year to protect fishery, wildlife, recreational, aesthetic, scenic, and other beneficial instream uses."  HRS § 174C-3.

water."  Id.; see also HRS § 174C-5(3) ("[T]he commission . . . [s]hall establish an instream use protection program designed to protect, enhance, and reestablish, where practicable, beneficial instream uses of water in the State[.]").  "Under the Code, therefore, instream flow standards serve as the primary mechanism by which the Commission is to discharge its duty to protect and promote the entire range of public trust purposes dependent upon instream flows."  Waiāhole I, 94 Hawai'i at 148, 9 P.3d at 460.

In order to fulfill this duty, we have held "the Commission must designate instream flow standards as early as possible, during the process of comprehensive planning, and particularly before it authorizes offstream diversions potentially detrimental to public instream uses and values."  Id.  The Water Code further permits the Commission to "reclaim instream values to the inevitable displacement of existing offstream uses."  Waiāhole I, 94 Hawai'i at 149, 9 P.3d at 461 (citing HRS § 174C-71(1)(E)).

The Code ultimately "envisions the establishment of bona fide 'permanent' instream flow standards as an ultimate objective in its mandated 'instream use protection program.'"  Waiāhole I, 94 Hawai'i at 150, 9 P.3d at 462 (citing HRS §§ 174C-5(3), -71(4)).  In the meantime, it contemplates IIFS "as a stopgap solution preceding the establishment of permanent

standards."  Id.  Although temporary, "interim standards must still provide meaningful protection of instream uses."  94 Hawai'i at 151, 9 P.3d at 463.

In that regard, the Commission shall establish interim standards "based on the best information presently available."  Waiāhole I, 94 Hawai'i at 156, 9 P.3d at 468.  The Commission "need only reasonably estimate instream and offstream demands."  Nā Wai 'Ehā I, 128 Hawai'i at 254, 287 P.3d at 155 (quoting Waiāhole I, 94 Hawai'i at 155 n.60, 9 P.3d at 467 n.60).  The Water Code "contemplates the designation of the standards based not only on scientifically proven facts, but also on future predictions, generalized assumptions, and policy judgments."  Waiāhole I, 94 Hawai'i at 155, 9 P.3d at 467.  Still, the Commission is to confront any scientific uncertainty "as systematically and judiciously as possible — considering every offstream use in view of the cumulative potential harm to instream uses and values and the need for meaningful studies of stream flow requirements."  94 Hawai'i at 159, 9 P.3d at 471.  Additionally, "the Commission should incorporate any allowances for scientific uncertainty into its initial determination of the minimum" IIFS, and a lack of adequate scientific information weighs toward incorporating more water into the IIFS.  See 94 Hawai'i at 156-57, 9 P.3d at 468-69 (rejecting the Commission's

formal "buffer" flows and noting several factors that weighed toward incorporating "much of the total present instream flows" into the windward O'ahu streams' IIFS).

Because the Commission has an affirmative duty to establish IIFS that "protect instream values to the extent practicable" and "protect the public interest," we have explained that in the context of IIFS petitions, the Water Code does not place a burden of proof on any particular party. Nā Wai 'Ehā I, 128 Hawai'i at 253, 287 P.3d at 154 (quoting Waiāhole II, 105 Hawai'i at 11, 93 P.3d at 653; HRS § 174C-71(2)(A)).

### 4. Water use permitting

Once an area is designated as a water management area for regulation pursuant to HRS § 174C-41, the Water Code requires existing and new users to obtain a water use permit from the Commission. See HRS § 174C-48(a).

Section 174C-49(a) enumerates the elements an applicant must establish in order to obtain a permit. HRS § 174C-49(a) (2011). The applicant must establish that the proposed use:

> (1) Can be accommodated with the available water source;
>
> (2) Is a reasonable-beneficial use as defined in section 174C-3;
>
> (3) Will not interfere with any existing legal use of water;
>
> (4) Is consistent with the public interest;
>
> (5) Is consistent with state and county general plans and land use designations;

50

(6) Is consistent with county land use plans and policies; and

(7) Will not interfere with the rights of the department of Hawaiian home lands . . . .

Id. For existing uses, if specified statutory criteria are met and the use is "reasonable and beneficial," the Water Code provides that the Commission shall issue a permit.[35]  HRS § 174C-50(b) (2011).[36]

The Code defines a use as "reasonable-beneficial" if it is "in such a quantity as is necessary for economic and efficient

---

[35]    Section 174C-55 (2011) of the Water Code addresses the duration of water permits issued; it provides, "Each permit for water use in a designated water management area shall be valid until the designation of the water management area is rescinded, unless revoked as provided in section 174C-58 or modified as provided in section 174C-57."  HRS § 174C-58, in turn, authorizes the Commission to suspend or revoke a permit for

> (1) Any materially false statement in the application for the water permit, a modification of a permit term, or any materially false statement in any report or statement of fact required of the user pursuant to this part.
>
> (2) Any wilful violation of any condition of the permit.
>
> (3) Any violation of any provision of this chapter.
>
> (4) Partial or total nonuse, for reasons other than conservation, of the water allowed by the permit for a period of four continuous years or more. . . .

Id.  Finally, section 174C-57 (2011) authorizes permittees to seek modification of permits "whether or not such change in use is of a material nature" and generally treats such modification requests as initial permit applications.
    In addition, every 20 years, the Water Code requires the Commission to conduct a comprehensive study of all permits issued under chapter 174C "to determine whether the conditions on such permits are being complied with," and to then prepare a formal public report.  HRS § 174C-56 (2011).

[36]    HRS § 174C-50(b) provides in relevant part, "the commission shall issue a permit for the continuation of a use in existence on the effective date of designation, if the criteria in subsection (a) are met and the existing use is reasonable and beneficial."

utilization, for a purpose, and in a manner which is both reasonable and consistent with the state and county land use plans and the public interest."  Id. § 174C-3.  Thus, section 174C-49(a)'s requirements (2) and (4) overlap.  Waiāhole I, 94 Hawai'i at 160, 9 P.3d at 472; see HRS §§ 174C-49(a)(2), (a)(4) (2011) (requiring a permit applicant establish their proposed use is "reasonable-beneficial" and "consistent with the public interest"), -3 (defining a "reasonable-beneficial use" in part as one that is consistent with the public interest).

> [T]he "reasonable-beneficial use" standard and the related criterion of "consistent with the public interest" demand examination of the proposed use not only standing alone, but also in relation to other public and private uses and the particular water source in question.  Hence, permit applicants requesting water diverted from streams must duly take into account the public interest in instream flows.

Waiāhole I, 94 Hawai'i at 161, 9 P.3d at 473.

Interpreting the Code's requirements together with the state water resources trust, we have held that in order for applicants to establish their proposed use is "reasonable-beneficial," they must, at a minimum, prove their "actual water needs."  94 Hawai'i at 161, 9 P.3d at 473 ("The Code's 'reasonable-beneficial use' standard allows use only 'in such a quantity as is necessary for economic and efficient utilization.'" (quoting HRS § 174C-3)).  They must also demonstrate, "within the constraints of available knowledge, the propriety of draining water from public streams to satisfy those

needs." 94 Hawai'i at 162, 9 P.3d at 474. "Furthermore, besides advocating the social and economic utility of their proposed uses, permit applicants must also demonstrate the absence of practicable mitigating measures, including the use of alternative water sources." 94 Hawai'i at 161, 9 P.3d at 473 ("Such a requirement is intrinsic to the public trust, the statutory instream use protection scheme, and the definition of 'reasonable-beneficial' use[.]" (footnote omitted)). See generally Waiāhole II, 105 Hawai'i at 15-16, 93 P.3d at 657-58 (summarizing water use applicants' burden).

Section 174C-54 (2011) of the Water Code addresses how the Commission should approach "competing" water applications:

> If two or more applications which otherwise comply with section 174C-49 are pending for a quantity of water that is inadequate for both or all, or which for any other reason are in conflict, the commission shall first, seek to allocate water in such a manner as to accommodate both applications if possible; second, if mutual sharing is not possible, then the commission shall approve that application which best serves the public interest.

HRS § 174C-54. Petitions for IIFS, however, "are not among the water use permit applications 'competing' under HRS § 174C-54." Waiāhole I, 94 Hawai'i at 148, 9 P.3d at 460.

Permit applicants have the "burden of justifying their proposed uses in light of protected public rights in the resource." 94 Hawai'i at 160, 9 P.3d at 472. "Under no circumstances . . . do the constitution or Code allow the

53

Commission to grant permit applications with minimal scrutiny."

Id.

**B.   The Hui/MTF and OHA's cross-appeals**

Pursuant to the state water resources trust and Water Code's framework, we first address the Hui/MTF and OHA's cross-appeals because they involve the IIFS.  See 94 Hawai'i at 148, 9 P.3d at 460 ("[T]he Commission must designate instream flow standards . . . before it authorizes offstream diversions potentially detrimental to public instream uses and values." (emphasis added)).  In their single point of error, the Hui/MTF and OHA assert the Commission failed to comply with its constitutional and statutory mandate to restore Nā Wai 'Ehā stream flows to the "extent practicable."  They contend this failure is evident on three levels, which we address in turn below.

**1.   The Commission failed to justify its decision to not restore additional stream flows**

First, the Hui/MTF and OHA assert the Commission's decision to maintain the "status quo" IIFS from the 2014 settlement is arbitrary and capricious and contrary to law because the Commission should have increased the Nā Wai 'Ehā IIFS (a) based on the closure of the last sugar plantation, HC&S, and (b) to accommodate permit allocations of downstream water rights and

54

uses.  We hold the Commission failed to justify its decision to not restore additional stream flows.

The Commission has a constitutional and statutory duty to restore Nā Wai 'Ehā stream flows to the extent practicable.[37]  See HRS § 174C-71(4) (2011) ("[T]he commission shall . . . [e]stablish an instream flow program to protect, enhance, and reestablish, where practicable, beneficial instream uses of water." (emphases added)); Waiāhole I, 94 Hawai'i at 141, 9 P.3d at 453 ("The state bears an 'affirmative duty to . . . protect public trust uses whenever feasible.'"[38] (second emphasis added)).  Furthermore, the "public trust may have to accommodate offstream diversions," but "all uses offstream or instream, public or private [must] promote the best economic and social interests of the people of this state."  Waiāhole I, 94 Hawai'i at 141, 9 P.3d at 453.

### a.    Closure of HC&S's sugar operations

As to the closure of HC&S, the Hui/MTF and OHA liken this case to Waiāhole I, a water case that also followed a historic closure of sugarcane operations.

---

[37]    "Practicable" is defined as "reasonably capable of being accomplished; feasible."  Practicable, Black's Law Dictionary (8th ed. 2004).

[38]    In a footnote in Waiāhole I, we explained that we did not read the term "feasible" narrowly to mean "capable of achievement," apart from any balancing of benefits and costs.  94 Hawai'i at 141 n.39, 9 P.3d at 453 n.39.

In Waiāhole I, we reviewed the Commission's decision setting IIFS for streams in windward O'ahu affected by the Waiāhole Ditch System. 94 Hawai'i at 110, 9 P.3d at 422. The areas surrounding Waiāhole Ditch were designated as ground water management areas in 1992. 94 Hawai'i at 111, 9 P.3d at 423. The ditch system operator filed a combined water use permit application for the existing users of ditch water. Id. Then, in 1993, Oahu Sugar Company, Ltd., a sugar plantation company that built much of the Waiāhole Ditch system and used much of the ditch's flow, announced closure of operations. Id. Various parties filed petitions to reserve ditch water, and a community group filed a petition to amend upward the IIFS for the windward streams. 94 Hawai'i at 111-12, 9 P.3d at 423-24.

In 1994, the various parties entered a mediation agreement, in which some water "surplus" was released into the windward streams. Waiāhole I, 94 Hawai'i at 112, 9 P.3d at 424. That "had an immediate apparent positive effect on the stream ecology." Id.

In 1997, the Commission issued its final decision, finding it "practicable" to restore a total of 6.0 mgd between two of the windward streams, Waiāhole and Waianu Streams. Waiāhole I, 94 Hawai'i at 113, 116-17, 147, 9 P.3d at 425, 428-29, 459. It increased the IIFS accordingly. Id. The Commission did not

56

mention the instream flow of a third windward stream, Waikāne Stream. 94 Hawai'i at 117, 9 P.3d at 429.

On review, we noted that the "close of sugar operations in Central O'ahu . . . provided the Commission [with] a unique and valuable opportunity to restore previously diverted streams while rethinking the future of O'ahu's water uses." Waiāhole I, 94 Hawai'i at 149, 9 P.3d at 461. We urged the Commission to "take the initiative in planning for the appropriate instream flows before demand for new uses heightens the temptation simply to accept renewed diversions as a foregone conclusion." Id. We stated that the Commission had improperly treated IIFS as "competing" with offstream diversions under the statutory provision that addresses "competing applications" for water use permits, HRS § 174C-54. 94 Hawai'i at 148, 9 P.3d at 460. We also expressed our concern with the Commission's "permissive view towards stream diversions, particularly while the instream flow standards remained in limbo," and noted that view violated the "law and logic of water resource management in this state." 94 Hawai'i at 160, 9 P.3d at 472. We vacated the Commission's IIFS, in part because the Commission improperly used formal "buffer" flows rather than incorporating any uncertainty into the minimal flow standard. 94 Hawai'i at 156, 9 P.3d at 468. We further noted several factors that weighed in favor of

incorporating "much of the total present instream flows" into the windward Oʻahu streams' IIFS, including:

> 1) the lack of proper studies and adequate information on the streams; 2) the corresponding inability of the Commission presently to fulfill the instream use protection framework; 3) the substantial, largely uncontroverted expert testimony that the present instream flows represent the minimum necessary to sustain an adequate stream habitat; 4) the Commission's finding that, "in general, it is expected that additional flows to the streams would increase the native biota habitat"; and 5) the Commission's generous provision for immediate and near-term offstream demands under a "prima facie" standard.

94 Hawaiʻi at 156-57, 9 P.3d at 468-69. We also remanded the IIFS as to Waikāne Stream because the Commission did not provide sufficient findings or conclusions "that would enable meaningful review of its decision." 94 Hawaiʻi at 158, 9 P.3d at 470.

Here, like the closure of sugar operations in Central Oʻahu in Waiāhole I, the closure of sugar operations in Central Maui provided the Commission with a "unique and valuable opportunity to restore previously diverted streams while rethinking the future" of the island's water uses. See 94 Hawaiʻi at 149, 9 P.3d at 461. Instead, however, the Commission effectively retained the "status quo" IIFS for Nā Wai ʻEhā streams from the 2014 agreement,[39] which the parties agreed to before HC&S closed

---

[39] The Commission made some small changes to the IIFS. Wailuku River had an IIFS of 10 mgd under the 2014 agreement; under the D&O II, Wailuku River still has an IIFS of 10 mgd, but that amount includes newly permitted instream public trust uses of 0.668 mgd, so there is 0.668 mgd less left in the stream for instream habitat and other instream uses that depend on stream flow, such as traditional and customary rights. For North Waiehu Stream, the IIFS effectively increased from 1.0 mgd to the stream's "natural flow" absent diversions (its $Q_{70}$ flow is 2.5 mgd). For South Waiehu Stream, the Commission

(continued. . .)

sugar operations. Rather than proactively addressing the historic opportunity to restore stream flows, in setting the IIFS, the Commission cited the benefits of the 2014 IIFS amendments,[40] stated that "[n]o further habitat studies have been conducted" since the 2014 amendments, and then expressly retained substantially similar IIFS.

This does not satisfy the state water resources trust. Trust duties require the Commission to make findings and conclusions expressly assessing whether the restoration of additional flow is "practicable" and would be in the public interest, for "the state may compromise public rights in the resource pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state." See Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455. The Commission

---

decreased the IIFS from 0.9 mgd to 0.3 mgd. With respect to Waihe'e River, the 2014 agreement set the IIFS at 10 mgd; in the D&O II, the Commission set the IIFS at 11.44 mgd to accommodate 1.44 mgd of newly permitted instream public trust uses and to retain the other 10 mgd in stream flow. Finally, the Commission expressly retained the IIFS for Waikapū Stream at 2.9 mgd.

[40]    FOF 291 provided

> The improved flow conditions in Waihe'e River and Waiehu Stream under the 2010 Decision and Order resulted in large increases in combined species habitat. Waiehu Stream gained over 3,500 combined species habitat units and went from 6.1% to 55.5% of natural habitat units. Waihe'e River gained over 2,400 combined species habitats and went from less than 1% to 11.1% of natural habitat units.

entered no finding expressly addressing whether it would be

"practicable" to restore additional stream flows to Nā Wai 'Ehā.

In addition, the Commission made insufficient findings and

conclusions on the value of restoring additional stream flow

versus authorizing additional offstream uses.  In COL 127, after

summarizing the "revival of instream values" of available

habitat units in Nā Wai 'Ehā streams following the 2010 and 2014

IIFS amendments, the Commission concluded,

> Any further increases in habitat from increasing the
> restoration flows will not result in proportionate
> increases.  The first amounts of increased flows in dry or
> very dry low-flow streams quickly result in large increases
> in wetted habitat, and the increases in wetted habitat from
> further increases in flow become less dramatic.

The Commission cited to a finding and conclusion from the D&O

I.[41]

COL 127 is inadequate justification for not restoring

additional stream flows to Nā Wai 'Ehā for several reasons.

First, the finding that COL 127 relies on, FOF 589 from the D&O

I,[42] suggests that IIFS should "increase[] incrementally over

---

[41]  In reaching this conclusion, the Commission cited FOF 589 and COL 244 from the 2010 D&O I.  COL 244 from the 2010 D&O I provided, "The Commission also notes that the first amounts of increased flow in dry or very low-flow streams quickly result in large increases in wetted habitat, and that the increase in wetted habitat from further increases in flows becomes less dramatic."

[42]  FOF 589 from the 2010 D&O I credited testimony from biologist expert witnesses called by HC&S in the first contested case hearing, John Ford and Thomas R. Payne, who recommended that

> restoration of flows, if any, should begin at a low level
> and increase[] incrementally over time.  Starting with a

(continued. . .)

time." It has been well over ten years since the 2010 amendments, and almost ten years since the most recent 2014 amendments to the IIFS; thus, the finding actually suggests the IIFS should now increase. Second, that finding suggested such time was necessary in order to properly study the effects of stream flow restoration, but the Commission has not sought out the information it needs through additional scientific studies or otherwise; further, Waiāhole I suggested a lack of proper studies and adequate information weighs in favor of higher stream flows. 94 Hawai'i at 156-57, 9 P.3d at 468-69. Third, the Commission's reliance on the amount of "wetted habitat" alone is insufficient justification for its decision to not further increase the IIFS. The Commission appears to ignore other instream values. See HRS § 174C-3 (defining instream uses

---

low level of releases helps in determining the incremental contributions of flow and their significance. Adequate time should be allowed to study both changes in habitat and biological responses to the releases at each increment. Starting with low increases in flows quickly result in a large benefit in terms of increasing the wetted habitat area of a stream. At higher flows, the increase in wetted habitat area from increasing flows becomes less dramatic.

The Commission then entered findings in the 2010 D&O I on the experts' testimony that increasing the Waihe'e River and Waiehu Streams' IIFS would "yield the most benefit in terms of increasing populations of native amphidromous species." However, in Nā Wai 'Ehā I, we vacated and remanded the Commission's D&O I, in part because the Commission did not adequately justify its decision to not restore streamflow to the other two streams, because it failed to consider instream uses other than amphidromous species. 128 Hawai'i at 251, 287 P.3d at 152.

broadly).[43]  Like in Nā Wai 'Ehā I, in which we held the
Commission's unexplained focus on amphidromous species over the
evidence of other instream uses was insufficient justification
to not restore stream flow to two streams; here, the
Commission's unexplained focus on "wetted habitat" is
insufficient justification to not restore stream flow following
the closure of HC&S.  See 128 Hawai'i at 251, 287 P.3d at 152.

The Commission argues it did not have to increase the IIFS,
even though the last sugar plantation closed, in part because it
properly considered other increased demands for water, including
by kalo growers with appurtenant rights who did not previously
have permits.  It is true that the Commission's decision
incorporated permits for new users with appurtenant rights, and
appurtenant rights are protected uses.  See HRS § 174C-63.  But
nowhere does the D&O II explain that this is the reason the
Commission decided not to increase the IIFS.

---

[43]    Under HRS § 174C-3, instream uses include, but are not limited to:

> (1) Maintenance of fish and wildlife habitats;
> (2) Outdoor recreational activities;
> (3) Maintenance of ecosystems such as estuaries, wetlands,
> and stream vegetation;
> (4) Aesthetic values such as waterfalls and scenic
> waterways;
> (5) Navigation;
> (6) Instream hydropower generation;
> (7) Maintenance of water quality;
> (8) The conveyance of irrigation and domestic water
> supplies to downstream points of diversion; and
> (9) The protection of traditional and customary Hawaiian
> rights.

At oral argument, counsel for the Commission represented that the Commission did not raise the IIFS largely because of increased demands from kalo farmers, and that the only other increases in water use were by municipal and domestic users. Counsel ignored other findings and conclusions in the D&O II about increased water demands by WWC's paying customers. FOF 132 states, "WWC's non-kuleana, paying customers have increased their requests for water, and new customers applying for water have also significantly increased." In any case, nothing in the D&O II sufficiently explains why the Commission decided not to restore additional stream flows.

Furthermore, the Commission's explanation that there are no new available studies on habitat is insufficient justification for retaining substantially similar IIFS. The Commission's failure to seek out further information does not justify it not restoring additional stream flows. As we said in Waiāhole I, "[u]ncertainty regarding the exact level of protection necessary justifies neither the least protection feasible nor the absence of protection." 94 Hawai'i at 155, 9 P.3d at 467. The Commission must (1) take the initiative to protect instream flows in considering the Hui/MTF and OHA's petition to amend the Nā Wai 'Ehā IIFS, and (2) incorporate any allowances for scientific uncertainty into the IIFS. See 94 Hawai'i at 143, 156, 9 P.3d at 455, 468.

In this case, the Commission's action appears to be the result of a passive failure to take the initiative to protect the public trust in the light of HC&S's closure.  We remind the Commission of this court's concern that "[e]very concession to immediate offstream demands . . . increases the risk of unwarranted impairment of instream values, ad hoc planning, and arbitrary distribution."  See Waiāhole I, 94 Hawaiʻi at 154, 9 P.3d at 466.  And we share Hui/MTF and OHA's skepticism that the "supposed takeaway" of the Commission's final decision is that "the transition from sugar to diversified agriculture has resulted in . . . a 1:1 replacement of plantation water uses with 'other uses.'"  If this is the case, though, the Commission must explain why that is in the public interest.

On a broader note, we again express our ongoing concern with the Commission's decision to continue to set "interim" instream flow standards for Nā Wai ʻEhā.  In 2012, concurring in Nā Wai ʻEhā I, Justice Acoba noted that "despite the temporality suggested in the term 'interim,' the IIFS in this case has not been modified into a permanent IFS in almost twenty-five years, since 1988.  Thus, under the circumstances, the IIFS practicably operates as a permanent instream flow standard."  128 Hawaiʻi at 264 n.7, 287 P.3d at 165 n.7.  It has been over an additional ten years since we decided Nā Wai ʻEhā I.  Moreover, Nā Wai ʻEhā

64

I was not the first time this court reminded the Commission of its duty to set permanent IFS for protected Hawai'i streams. See Waiāhole I, 94 Hawai'i at 156, 9 P.3d at 468 (directing the Commission to "with utmost haste and purpose, work towards establishing permanent instream flow standards for [O'ahu] windward streams"); Waiāhole II, 105 Hawai'i at 12, 93 P.3d at 654 (reminding the Commission that "seventeen years ha[d] passed since the Water Code was enacted requiring the Water Commission to set permanent instream flow standards by investigating the streams" and an additional four years had passed since the court's Waiāhole I directive). IIFS are intended to be a "stopgap" measure to protect stream flows. Waiāhole I, 94 Hawai'i at 150, 9 P.3d at 462. They are defined as a "temporary instream flow standard of immediate applicability, adopted by the commission without the necessity of a public hearing, and terminating upon the establishment of an instream flow standard." HRS § 174C-3. They are not intended to be a decades-long semi-permanent solution, nor the resolution of a years-long contested case proceeding. See id.

Even if not "interim," instream flow standards can still be modified. See id. § 174C-71(D), (F) (2011). The Commission should therefore, with "utmost haste," complete any further

needed investigation of the streams and enter instream flow standards.[44]  See Waiāhole I, 94 Hawai'i at 156, 9 P.3d at 468.

### b.    Incorporation of downstream uses into the IIFS

The Hui/MTF and OHA also argue the final decision fails to comply with the legal requirement to protect downstream water rights and uses by incorporating them into the IIFS.

Section 174C-3 of the Water Code defines "instream flow standard" inter alia as a quantity or flow or depth of water required to protect "beneficial instream uses"; it defines "instream uses," in turn, as "beneficial uses of stream water for significant purposes which are located in the stream and which are achieved by leaving the water in the stream."  HRS § 174C-3.  It then provides an illustrative list of instream uses, including the "conveyance of irrigation and domestic water supplies to downstream points of diversion" and the "protection of traditional and customary Hawaiian rights."  Id.  Section 174C-71 also directs the Commission to express instream flow standards "in terms of variable flows of water necessary to protect adequately . . . beneficial instream uses in the stream."  Instream flow standards "serve as the primary

---

[44]    The Hui/MTF stated at oral argument that permanent instream flow standards require rulemaking.  But in Waiāhole I, we noted that the Water Code "does not even require rulemaking for the establishment of permanent standards."  94 Hawai'i at 151, 9 P.3d at 463 (citing HRS § 174C-71(1)(F)) (rejecting the contention that the Commission improperly amended the IIFS via adjudication instead of rulemaking).

mechanism by which the Commission is to discharge its duty to protect and promote the entire range of public trust purposes dependent upon instream flows." Waiāhole I, 94 Hawai'i at 148, 9 P.3d at 460.

IIFS should include uses downstream of the IIFS measuring point; otherwise, the downstream diversions would diminish other protected instream uses, like habitat and retention of stream water in its natural state. The Commission also seems to agree -- the D&O II states in paragraph 32, "sufficient flows must be added [to the IIFS] for permittees and domestic users downstream of the IIFS locations." Paragraph 30 further states, "The flows established below the diversions shall be augmented by the amounts necessary to meet the requirements of downstream water use permittees and domestic users."[45]

The Commission incorporated at least some downstream uses into the IIFS. For Waihe'e River, the Commission set the IIFS at

---

[45] The Hui/MTF and OHA argue the D&O II's directives in paragraphs 30 and 32 suggest the Commission did not wholly incorporate downstream rights and uses into the IIFS because they suggest future action is required to augment the flows to meet downstream users' water needs. Those provisions appear to have been an appropriate caveat where additional downstream parties may later receive permits. See infra Section IV.E.2 (analyzing WWC's argument on cross-appeal that these paragraphs, among others, constituted unlawful delegation). For example, some users have recognized appurtenant rights but did not yet receive permits because they did not appear at the contested case hearing or otherwise fully participate in the permitting process. By the Hui/MTF and OHA's own arguments, the Commission should adjust the IIFS accordingly. As no party raises it as an issue, we do not decide whether nonpermitted appurtenant downstream users' rights should have been incorporated into the IIFS in the first instance.

67

11.44 mgd and expressly stated that figure included 10 mgd for instream habitat and 1.44 mgd for instream traditional and customary uses associated with the downstream North Waihe'e 'auwai that are fed directly through the stream (not through WWC's system). For Wailuku River, the Commission set the IIFS at 10 mgd; the Wailuku River table indicated this amount included 0.668 mgd for "permitted public trust uses that draw water directly from the Wailuku River,"[46] thus leaving approximately 9.332 mgd for instream habitat. The Commission did not note the incorporation of any downstream uses in the IIFS for North or South Waiehu Stream or Waikapū Stream.

It is unclear whether the Commission's IIFS sufficiently incorporated downstream uses. It is not clear, for example, why the Commission apparently did not incorporate into the IIFS downstream uses that draw directly from the Waihe'e River below the Spreckels Ditch diversion.[47]

Additionally, the D&O II does not appear to include any explanation for its effective decrease of the IIFS for Wailuku

---

[46]    In a footnote, the Commission says this amount does not include permitted public trust uses that draw from the ditch system.

[47]    According to the Hui/MTF and OHA, those include SWUPAs 2365N, 3470N, and 2362N, which are allocated a total of 607,500 gpd (157,500 gpd, 150,000 gpd, and 300,000 gpd, respectively). The Hui/MTF and OHA also point out that SWUPA 2706N was allocated a total of 1.35 mgd and incorrectly grouped in its entirety in the D&O II under uses on the South Waihe'e 'auwai, even though its application and testimony requested water for only two acres from the South Waihe'e 'auwai, and seven acres directly from the Waihe'e River.

River.  The 2014 amendments set the IIFS for Wailuku River at 10 mgd, and the D&O II kept the IIFS at 10 mgd; however, it also authorized 0.668 mgd of new "permitted public trust uses that draw water directly from the Wailuku River."  Thus, following the D&O II, 0.668 mgd less appears to be available for other instream uses.  The DO II fails to explain this decision.

Neither does the D&O II include any findings on whether other nonpermitted appurtenant rights might exist downstream and how those are considered in the Commission's decision.[48]

Thus, as to the incorporation of downstream uses into the IIFS, the D&O II does not evince the "level of openness, diligence, and foresight" that is required where water public trust resources are at stake.  See Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455.  This lack of clarity also warrants remand.  See 94 Hawai'i at 158, 9 P.3d at 470.

### 2.   The D&O II does not satisfy Ka Pa'akai

Next, the Hui/MTF and OHA assert the Commission failed to adequately justify the IIFS by entering required findings and conclusions to protect Native Hawaiian rights and other instream uses to the extent feasible.

---

[48]   According to the Hui/MTF, the Commission has conducted studies projecting what other nonpermitted appurtenant rights may exist downstream for other streams but did not do so here.  We emphasize that the Water Code expressly preserves those rights.  See HRS §§ 174C-63, -101(d) (2011).

69

Article XII, Section 7 of the Hawai'i Constitution provides, "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights." "This provision places an affirmative duty on the State and its agencies to preserve and protect traditional and customary native Hawaiian rights" to the "extent feasible." Ka Pa'akai, 94 Hawai'i at 45-46, 7 P.3d at 1082-83 (first citing Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of 1978, at 639 (1980); and then quoting Pub. Access Shoreline Haw. v. Haw. Cnty. Plan. Comm'n (PASH), 79 Hawai'i 425, 450 n.43, 903 P.2d 1246, 1271 n.43 (1995)).

Traditional and customary Native Hawaiian rights also are a protected water use under the state water resources trust. Kauai Springs, 133 Hawai'i at 172, 324 P.3d at 982 (citing Waiāhole I, 94 Hawai'i at 137, 9 P.3d at 450). Accordingly, the Water Code also expressly "obligates the Commission to ensure that it does not 'abridge or deny' traditional and customary rights of Native Hawaiians." Waiāhole I, 94 Hawai'i at 153, 9 P.3d at 465 (citing HRS §§ 174C-63, (1993), -101(c) (1993)).

Ka Paʻakai controls as to the required findings and conclusions on traditional and customary Native Hawaiian rights. In Ka Paʻakai, this court reviewed the Land Use Commission's ("LUC") grant of a developer's petition to reclassify over 1,000 acres of land on Hawaiʻi Island from a state land use "conservation district" to a state land use "urban district." 94 Hawaiʻi at 34, 7 P.3d at 1071. In vacating the LUC's grant of the petition, we held in part that the LUC, as a matter of law, failed to satisfy its statutory and constitutional obligations to preserve and protect traditional and customary Native Hawaiian rights. 94 Hawaiʻi at 35, 7 P.3d at 1072.

In making that determination, we explained that in "order for the rights of native Hawaiians to be meaningfully preserved and protected, they must be enforceable." 94 Hawaiʻi at 46, 7 P.3d at 1083. Thus, we set forth an "analytical framework" for enforcement, in order to "accommodate the competing interests of protecting native Hawaiian culture and rights, on the one hand, and economic development and security, on the other." Id. (citing PASH, 79 Hawaiʻi at 447, 903 P.2d at 1268; Kalipi v. Haw. Trust Co., 66 Haw. 1, 7, 656 P.2d 745, 749 (1982); Comm. Whole Rep. No. 12, in 1 Proceedings of the Constitutional Convention of 1978, at 1016 (1980)). We held that, in order to fulfill its duty to preserve and protect traditional and customary Native

71

Hawaiian rights to the extent feasible, the State agency "must -- at a minimum -- make specific findings and conclusions as to the following":

> (1) the identity and scope of "valued cultural, historical, or natural resources" in the petition area, including the extent to which traditional and customary native Hawaiian rights are exercised in the petition area; (2) the extent to which those resources -- including traditional and customary native Hawaiian rights -- will be affected or impaired by the proposed action; and (3) the feasible action, if any, to be taken by the [agency] to reasonably protect native Hawaiian rights if they are found to exist.

94 Hawai'i at 46-47, 7 P.3d at 1083-84 (footnotes omitted).

Applying the framework to the facts of that case, we noted the LUC entered a "handful of findings potentially implicating" Native Hawaiian rights but failed to enter definitive findings or conclusions regarding the extent of Native Hawaiian practitioners' exercise of traditional and customary practices in the subject area, the effects on or the impairment of those rights, or the feasibility of protecting those rights. 94 Hawai'i at 47-49, 7 P.3d at 1084-86. We thus remanded to the LUC to enter specific findings and conclusions on the three prongs of the framework, noting the "promise of preserving and protecting customary and traditional rights would be illusory absent findings on the extent of their exercise, their impairment, and the feasibility of their protection." 94 Hawai'i at 50, 53, 7 P.3d at 1087, 1090.

In Nā Wai ʻEhā I*,* we held the Commission's D&O I did not satisfy prongs (2) and (3) of the Ka Paʻakai framework. Nā Wai ʻEhā I*,* 128 Hawaiʻi at 248-49, 287 P.3d at 149-50. We acknowledged that the Commission's findings and conclusions were "very thorough in several respects, including its documentation of the area's native Hawaiian practices." 128 Hawaiʻi at 248, 287 P.3d at 149. For instance, the Commission entered findings indicating a "distinct connection" between Nā Wai ʻEhā and Hawaiian history and culture, the ongoing Native Hawaiian practices still exercised in Nā Wai ʻEhā, and "the connection between current traditional and customary practices and streamflow levels." 128 Hawaiʻi at 245-46, 287 P.3d at 146-47. Nevertheless, we concluded the D&O I lacked findings and conclusions regarding prong (2), the effect of the amended IIFS on Native Hawaiian practices in Nā Wai ʻEhā, and prong (3), the feasibility of protecting those practices. 128 Hawaiʻi at 248, 287 P.3d at 149. In particular, we rejected HC&S's argument that the Commission's findings and conclusions were adequate because "if instream fauna populations increase as a result of the amended IIFS as [the Commission] anticipates they will, that would support gathering practices." 128 Hawaiʻi at 248, 287 P.3d at 149. We explained those findings did not satisfy Ka Paʻakai and, furthermore,

73

> even if the court accepted HC & S's post hoc explanation to be adequate, this would only resolve rights to gather amphidromous species, but the Commission concluded that gathering rights in Nā Wai 'Ehā also encompassed several other species. The Commission's analysis does not examine whether the amended IIFS impact these gathering rights, or whether any negative impact may be avoided.

Nā Wai 'Ehā I, 128 Hawai'i at 248-49, 287 P.3d at 149-50. Thus, we vacated the D&O I and remanded to the Commission for further consideration of the effect of the IIFS on Native Hawaiian practices and the feasibility of protecting those practices. 128 Hawai'i at 249, 287 P.3d at 150.

The Hui/MTF and OHA argue the Commission repeated its error here; they assert the FOFs and COLs in the D&O II are a "near complete copy" of those in the D&O I and again fail to satisfy prongs (2) and (3) of the Ka Pa'akai framework. The D&O II indeed repeated nearly verbatim many of the FOFs and COLs regarding traditional and customary Native Hawaiian rights in Nā Wai 'Ehā from the D&O I, which we held were sufficient to satisfy prong (1), but not prongs (2) and (3), of Ka Pa'akai. See Nā Wai 'Ehā I, 128 Hawai'i at 245-48, 287 P.3d at 146-49. To the credit of the Commission, the D&O II again included extensive findings on the cultural significance of Nā Wai 'Ehā and the historical extent of traditional and customary rights in the area. It also included findings on the extent of traditional and customary practices today, and how stream flow and diversions generally impact those practices. In addition, it included general

findings regarding the potential restoration and expansion of traditional and customary rights if stream flows are increased.[49]

As to the disputed prongs (2) and (3) of Ka Pa'akai, however, the Commission's retort that it set IIFS and allocated permits to ensure water was available for the exercise of traditional and customary rights and issued permits to lo'i kalo growers, is, on its face, insufficient to satisfy Ka Pa'akai. Again, Ka Pa'akai requires specific findings and conclusions on the three prongs so that Native Hawaiian rights are enforceable. 94 Hawai'i at 47, 7 P.3d at 1084. As in Nā Wai 'Ehā I, the Commission's post hoc explanation here is insufficient. 128 Hawai'i at 248-49, 287 P.3d at 149-50.

As to specific findings and conclusions on prong (2), we note that in COL 135 of the D&O II, the Commission concluded, "[t]he likelihood of negative consequences to kuleanas exercising recognized traditional and customary Native Hawaiian rights . . . is low, as [they] are recognized as having the highest priority for noninstream uses."[50] That COL addressed the

_____

[49]   FOFs 285 through 288 expressly state how restoration of Nā Wai 'Ehā stream flows generally would impact traditional and customary Native Hawaiian rights. But those findings were also made in Nā Wai 'Ehā I, in which we held the Commission did not satisfy prongs (2) or (3) of the Ka Pa'akai framework. See Nā Wai 'Ehā I, 128 Hawai'i at 245-48, 287 P.3d at 146-49. And they do not address how the Commission's decision at hand -- to largely retain the current IIFS -- actually impacts those rights.

[50]   The Commission cited COL 174, which is the Commission's priority list for "competing uses," and lists traditional and customary Native Hawaiian
(continued. . .)

effect of the Commission's IIFS decision on noninstream kuleana traditional and customary Native Hawaiian rights but did not address the effect of the decision on numerous other instream traditional and customary Native Hawaiian rights, such as gathering rights.

Various FOFs also summarized the impacts of the 2010 and 2014 IIFS amendments. Those findings implicitly relate to the impact of the Commission's action on traditional and customary rights. The Commission largely retained the IIFS from the 2014 agreement, so the benefits would presumably extend to the Commission's actions in its final decision here as well. For example, FOF 291 assesses increased species habitat following the 2014 amendments, which directly impacts the ability to exercise instream gathering rights. But implicit findings on the effects on traditional and customary Native Hawaiian rights are insufficient. Like in Nā Wai 'Ehā I, where we rejected as inadequate to satisfy Ka Pa'akai the Commission's findings that instream fauna populations would increase as a result of the amended IIFS, here, the Commission's findings that species habitat has increased under the 2010 and 2014 IIFS are

---

rights amongst the uses in priority 1. COL 135 also appears to contradict BLNR's assertion in oral argument that kalo is an instream use.

inadequate to satisfy Ka Pa'akai.  See Nā Wai 'Ehā I, 128 Hawai'i
at 248-49, 287 P.3d at 149-50.

Furthermore, nothing in the D&O II expressly addressed
prong (3), the feasibility of protecting traditional and
customary rights.

In sum, the Commission did not comply with Ka Pa'akai
because it did not enter findings and conclusions on the D&O
II's impact on instream traditional and customary rights and the
feasibility of protecting those rights.

For that reason, too, we vacate the Commission's D&O II as
amended by the errata and remand for further proceedings.  See
Nā Wai 'Ehā I, 128 Hawai'i at 249, 287 P.3d at 150 (vacating and
remanding the D&O I for the same reason).  As on remand in Nā
Wai 'Ehā I, should the Commission determine that the current IIFS
will negatively impact protected Native Hawaiian practices and
that protection of those practices is feasible, "the Commission
may enter amended IIFS to reflect that protection."  See id.

3.   **At times, the D&O II lacks reasonably transparent and
clear calculations**

Finally, the Hui/MTF and OHA assert the Commission failed
to provide transparent and comprehensible calculations for its
IIFS determinations.

> A court reviewing the decision of an agency should
> ensure that the "agency . . . make its findings reasonably
> clear.  The parties and the court should not be left to
> guess . . . the precise finding of the agency."  An

77

>           agency's findings should be "sufficient to allow the
>           reviewing court to track the steps by which the agency
>           reached its decision."

Kauai Springs, 133 Hawai'i at 164, 324 P.3d at 974 (first quoting

Waiāhole I, 94 Hawai'i at 157, 9 P.3d at 469; and then quoting

Kilauea Neighborhood Ass'n, 7 Haw. App. at 230, 751 P.2d at

1034).  The "state may compromise public rights in the resource

pursuant only to a decision made with a level of openness,

diligence, and foresight commensurate with the high priority

these rights command under the laws of our state."

Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455.

     We agree the D&O II lacked reasonably transparent and clear

calculations in at least some respects.  The lack of detail in

the D&O II regarding exactly which permits fall into each

category in the low-flow IIFS tables renders the Commission's

decision not reasonably clear or sufficient for us to

meaningfully review.  See Kauai Springs, 133 Hawai'i at 164, 324

P.3d at 974.  In this case, where the record is voluminous, a

clear and precise view of the water available in the streams,

the IIFS, and the permits issued is essential for us to track

how the Commission made its decisions.[51]

---

[51]     The Hui/MTF and OHA also point out various inconsistencies in the
Commission's executive summary.  For instance, the executive summary states
that the IIFS "established in the Waihe'e, Waiehu, and Waikapū streams are
estimated to protect 80% of the available habitat" and "[i]n the case of
Wailuku River, a higher level of habitat protection of 88% was left in
                                             (continued. . .)

Finally, regarding WWC's SWUP for system losses, the D&O II stated, "WWC is issued an existing use permit for system losses of 2.73 mgd, or approximately 4.97% of water diverted for delivery to authorized users."  It then ordered WWC to make water deliveries to specified distribution points in specified amounts totaling 9.569 mgd.[52]  4.97% of 9.569 mgd is only 475,579 gpd.  On its face, this appears to be inconsistent with the D&O II's statement that WWC's permit amount is equivalent to "approximately 4.97% of water diverted for delivery to authorized users."[53]  (Emphasis added.)

For this reason, too, we vacate and remand the Commission's final decision for additional findings and conclusions.  See, e.g., Waiāhole I, 94 Hawai'i at 158, 9 P.3d at 470 (recognizing remand as an appropriate remedy "where the agency has made

---

place."  But the D&O II expressly states only 11.1% of available habitat was restored in Waihe'e River, and 55.5% in Waiehu Stream.

The Commission declines to explain any of the discrepancies in its executive summary, asserting that the executive summary is not part of its official final decision for this court to review.  We agree with the Commission but remind the Commission of its duty to make findings reasonably clear so that the reviewing court can track the steps by which it reached its decision.  See Kauai Springs, 133 Hawai'i at 164, 324 P.3d at 974.

[52]   The D&O II mandated the following individual delivery amounts to specified distribution points:  4.021 mgd to South Waihe'e 'Auwai, 0.153 mgd to Field 4 'Auwai, 1.469 mgd to 'Īao-Maniania, 3.552 mgd to 'Īao-Waikapū Ditch, 0.088 mgd to Wailuku Town Kuleana Pipeline, 0.265 mgd to South Waikapū 'Auwai, and 0.021 mgd to Pi'ihana-Field 49 Kuleana Pipe.

[53]   It appears the Commission calculated WWC's system losses as 2.73 mgd by multiplying 4.97% by the total approximate mean base flows ($Q_{70}$ flows) in the four streams – 55 mgd — rather than the amount permitted to be diverted (55 mgd x 4.97% = 2.7335 mgd).  There is no explanation of that apparent discrepancy in the D&O II to satisfy our close review.

invalid, inadequate, or incomplete findings"); Kauai Springs, 133 Hawai'i at 181, 324 P.3d at 991 (remanding to the county planning commission for clarification).

## C. MMK's appeal

We next turn to MMK's appeal involving its SWUP.

Several of MMK's points of error involve the Commission's decision to set MMK's water allocation at 2,500 gad, the same water duty that the Commission set for diversified agriculture uses. In its opening brief, MMK initially argues the Commission erroneously classified its water use for golf courses as a type of "diversified agriculture." The Hui/MTF, OHA, and the Commission disagree. In its reply brief, MMK concedes the Commission did not actually classify MMK's use as "diversified agriculture," but nonetheless maintains the Commission improperly set its permit allocation at the same water duty as "diversified agriculture." (Emphasis added.) We analyze MMK's points of error accordingly.[54]

---

[54] We note that COL 95 contains an error. In COL 95, the Commission apparently classified golf courses within "agriculture." It stated, "The Commission therefore does not adopt a higher amount for small farmers versus larger farmers but instead adopts the lesser amount, 2,500 gad, as the maximum irrigation requirement for both large- and small-scale agriculture of all types of crops, including nurseries, orchards, and golf courses." Golf courses should not be classified as a type of agriculture. See Waiāhole I, 94 Hawai'i at 168-69, 9 P.3d at 480-81 (holding the Commission did not err in excluding golf course irrigation from the category of "agricultural use"). However, this error is harmless because other places in the Commission's D&O II expressly classify MMK's use as "recreational," and expressly set MMK's recreational use at the same water duty as diversified agriculture. The D&O II's order concerning MMK's SWUPA 2186 states in relevant part, "There is no

(continued. . .)

1.      **The Commission's allocation of 762,500 gpd to MMK based on a 2,500 gad standard is not clearly erroneous**

First, MMK asserts its water allocation of 762,500 gpd is clearly erroneous because MMK proved its request for 1.25 mgd for operation of its two golf courses was "reasonable-beneficial" and representative of its actual water needs as required by the Water Code, yet the Commission ignored that evidence and instead allocated MMK water based on a 2,500 gad standard (2,500 gad x 305 acres = 762,500 gpd).

All parties rely on Waiāhole I.  In Waiāhole I, the Commission assigned diversified agriculture uses an allocation of 2,500 gad, unless they could properly show they required more.  94 Hawai'i at 117, 9 P.3d at 429.  This court noted the Commission had a lack of data on actual uses for diversified agriculture, largely resulting "from the embryonic state of diversified agricultural operations."  94 Hawai'i at 162, 9 P.3d at 474.  We then stated the Commission's 2,500 gad determination appeared appropriate at that time but reiterated that "permits should reflect actual water needs."  Id. (emphasis added).  We nonetheless vacated the 2,500 gad figure because the Commission

reason to differentiate and give a higher water duty to a recreational use than to diversified agriculture.  The Commission will recognize MMK's use of 305 acres for turf and miscellaneous landscaping at the same water duty as diversified agriculture."  (Emphasis added.)

applied it even to uncultivated lands, resulting in an over-allocation of water.[55]  94 Hawaiʻi at 162-64, 9 P.3d at 474-76.

Waiāhole I also distinguished golf course uses from agricultural uses.  94 Hawaiʻi at 167-68, 9 P.3d at 479-80.  We acknowledged the Commission's authority to subject golf courses to a higher standard than agricultural uses and impose "exclusive restrictions" on nonagricultural uses.  94 Hawaiʻi at 168-69, 9 P.3d at 480-81.  We deferred to the Commission's restrictions, stating that "such measures lay squarely within the Commission's appointed function of weighing and negotiating competing interests in regulating the water resources of this state."  Id.

Here, the Commission entered findings on MMK's average historical water use, found MMK had taken several steps to mitigate water use, and found MMK had investigated alternative sources of water and had determined that none were reasonable.  The Hui/MTF and OHA continue to assert that MMK did not meet its burden regarding potential alternative sources of water.  During oral argument, MMK further indicated reasonable alternative

---

[55]    In Waiāhole II, we again affirmed the Commission's allocation of 2,500 gad with respect to cultivated acres of diversified agriculture.  105 Hawaiʻi at 22, 93 P.3d at 664.  But we noted that because "diversified agriculture is no longer in its embryonic stage," we did "not condone a blanket application of 2,500 gad to all future allotments of water for diversified agriculture.  Instead, the . . . Commission must continue making decisions based on the best information available."  105 Hawaiʻi at 23, 93 P.3d at 665.

sources were not available because municipal water is cost prohibitive, there is a lack of other ditch systems, desalinization plants are unavailable, ground water is cost prohibitive and potable water cannot be used for golf courses, storm water reclamation is not available, and waste water lines are not available from treatment facilities.

In Nā Wai ʻEhā I we remanded in part for the Commission's consideration of Well No. 7 as an alternative source of water. 128 Hawaiʻi at 258-62, 287 P.3d at 159-63. We said the Commission erred when it decided Well No. 7 was not an alternative due to cost while explicitly acknowledging it did not have the data it needed to truly analyze cost. 128 Hawaiʻi at 262, 287 P.3d at 163. Although, as discussed above, the Commission did consider Well No. 7 on remand, in Nā Wai ʻEhā I, we also said with respect to recycled wastewater:

> Hui/MTF argues that the Commission erred in failing to consider the practicability of using recycled wastewater from the Wailuku/Kahului wastewater treatment plant. In its FOF/COL D & O, the Commission concluded that at least 5 mgd of recycled wastewater "is currently disposed of via underground injection." In response to Hui/MTF's urging that HC & S be required to utilize this water, the Commission found that "the County currently has no existing infrastructure to deliver recycled wastewater to HC & S's fields." The Commission also heard testimony that "private parties could construct their own pipeline to the plant." The Commission appears to have concluded that this alternative did not merit consideration, based solely on the current lack of infrastructure. This decision does not evince "a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state." In re Waiʻola, 103 Hawaiʻi at 422, 83 P.3d at 685. The recycled wastewater was quantified as "at least 5 mgd"; 5 mgd is nearly enough water to satisfy all kuleana users in Nā Wai ʻEhā and would

83

> be a significant contribution to HC & S's water needs. On
> remand, the Commission must evaluate this alternative with
> "openness, diligence, and foresight" to determine whether
> it is a viable alternative to diverting Nā Wai 'Ehā water.

Nā Wai 'Ehā I, 128 Hawai'i at 262, 287 P.3d at 163 (emphasis

added). It does not appear the Commission addressed this

mandate on remand. Thus, on further remand, the Commission must

properly address possible alternative sources of water.

The Commission did conclude that neither MMK's request for

1.25 mgd, nor MMK's lowest use of 1.037 mgd, was "reasonable-

beneficial." It then instead granted MMK the allocation of

762,500 gpd based on the 2,500 gad standard.[56]

MMK is correct that its granted water allocation does not

reflect its "actual" water needs in terms of the Commission's

findings about MMK's historical water use. But Waiāhole I's

admonition that permits should reflect "actual water needs" does

not stand for the proposition that the Commission must grant all

parties who demonstrate an existing use a permit in the full

amount that they "need," or have historically used. See 94

Hawai'i at 162, 9 P.3d at 474. Rather, the court was concerned

with the Commission using categorical figures instead of seeking

---

[56] On appeal, MMK complains the allocated water is insufficient to run both its private and public golf courses, so it has been forced to effectively shut down the public course. MMK represented it allocates 95% of the water granted in its SWUP to the private course and distributes only 5% of the water granted to the public course. We note MMK's water distribution does not appear to align with the intent of the Commission's final decision, which allocated water to Mahi Pono on a per acre basis.

out data on actual water use, largely due to the risk of over-allocation.  See 94 Hawai'i at 163-64, 9 P.3d at 475-76.

Generally, a permit not based on actual water use is not "reasonable-beneficial" because it is not in a quantity "necessary for economic and efficient utilization."  See HRS § 174C-3.  However, even where a party demonstrates its "actual water need" as required by the Water Code, the Commission may still determine, in its discretion, that an applicant's use or requested amount is not "reasonable-beneficial."  See id.  This is because in issuing water use permits, the Commission has a duty not only to consider actual need, but also other factors, including the proposed usage in relation to other "public and private uses."  94 Hawai'i at 161, 9 P.3d at 473.

There are hundreds of other FOFs and COLs in the D&O II regarding other competing water uses, public and private, which the Commission had a duty to weigh in adjudicating MMK's SWUPA. Still, "where the record demonstrates considerable conflict or uncertainty in the evidence, the agency must articulate its factual analysis with reasonable clarity, giving some reason for discounting the evidence rejected."  94 Hawai'i at 163-64, 9 P.3d at 475-76.  We cannot speculate regarding possible justifiable bases for the Commission's decision, for a "reviewing court must judge the propriety of agency action solely by the grounds invoked by the agency, and that basis must be set forth with

such clarity as to be understandable." See 94 Hawai'i at 163, 9 P.3d at 475.

Here, the Commission clearly explained its reason for rejecting MMK's requested amount of 1.25 mgd as not "reasonable-beneficial," stating the request, "based in part on dry years as well as average years, is similar to requesting priority access to water during periods of water shortage over other permittees in advance."

The Commission also gave a reason for rejecting even MMK's lowest use of 1,037 mgd as not "reasonable beneficial" -- namely, that "[t]here is no reason to differentiate and give a higher water duty to a recreational use than to diversified agriculture. The Commission will recognize MMK's use of 305 acres for turf and miscellaneous landscaping at the same water duty as diversified agriculture."

We hold the Commission's decision to set MMK's use at the same water duty as diversified agriculture is reasonably clear. The Commission found, and MMK does not dispute, that MMK's golf course use consisted of irrigation of 302 acres of Bermuda turf grass and three acres of other miscellaneous landscape. Given that both the diversified agriculture users and MMK use water for turf grass and landscape, the Commission's determination that there is "no reason to differentiate" between the two uses is not clearly erroneous.

MMK further argues the Commission should have prioritized its existing use over all new uses except those based on appurtenant rights.

Section 174C-49(a)(3) of the Water Code requires permit applicants to establish in relevant part that their use "[w]ill not interfere with any existing legal use of water," suggesting that new use permit applicants should not be prioritized over existing uses (at least where the existing use applicant meets their burden of proof). See HRS § 174C-49(a)(3). MMK points to the Commission's own priority list in the D&O II, which lists "existing uses" above "new uses." However, there are no "absolute priorities between broad categories of uses" under the public trust. See Waiāhole I, 94 Hawaiʻi at 142, 9 P.3d at 454. The D&O II also expressly states its priority list is not absolute;[57] rather, assessing the SWUPAs before it on a case-by-case basis, the Commission granted water to some new uses, primarily for agricultural uses, which it determined are in the public interest. The Commission was not required to categorically prioritize MMK's existing golf course and, indeed,

---

[57] COL 6 in the D&O II quoted Waiāhole I for the proposition that there are no "absolute priorities between broad categories of uses under the water resources trust." Then, in COL 133, after setting the priority guidelines, the Commission stated, "[t]hese do not represent absolute priorities amongst type of uses but [are] being used by the Commission in this case to guide how water will be allocated amongst uses." (Emphasis added.)

could not do so where it found the requested water amount was not "reasonable-beneficial."

Therefore, the Commission's allocation of 762,500 gpd to MMK based on a 2,500 gad standard is not clearly erroneous.

### 2. The Commission's decision to set MMK's use at the same water duty as diversified agriculture does not violate HAPA

In its second point of error, MMK contends the Commission's decision to set MMK's golf course use at the same water duty as diversified agriculture is arbitrary and inconsistent with precedent, ignores evidence of its actual water needs, and consists of unlawful rulemaking and/or unlawful policymaking through adjudication in violation of HAPA. We have already determined the Commission's decision to set MMK's use at 2,500 gad is not arbitrary, inconsistent with precedent, or contrary to the evidence. We turn to MMK's HAPA argument.

#### a. Unlawful rulemaking

Under HAPA, a rule means "each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency." HRS § 91-1 (Supp. 2017). This definition encompasses two elements. Green Party of Haw. v. Nago, 138 Hawai'i 228, 237, 378 P.3d 944, 953 (2016). "The first element is that the agency statement be of (a) general or particular applicability and (b)

88

future effect.  The second element provides that the agency statement (a) implements, interprets, or prescribes law or policy, or (b) describes the organization, procedure, or practice requirements of any agency."[58]  Id.

The "line between [agency rulemaking and adjudication] is not always a clear one and in fact the two functions merge at many points."  Waiāhole I, 94 Hawai'i at 169, 9 P.3d at 481 (quoting Shoreline Transp., Inc. v. Robert's Tours & Transp., Inc., 70 Haw. 585, 591, 779 P.2d 868, 872 (1989)).  "One useful distinction between rulemaking and adjudication is that 'the former affects the rights of individuals in the abstract, while the latter operates concretely upon individuals in their individual capacity.'"  Id. (quoting In re HECO, 81 Hawai'i at 466-67, 918 P.2d at 568-69) (cleaned up).  Additionally, "rule-making is essentially legislative in nature because it operates in the future; whereas, adjudication is concerned with the determination of past and present rights and liabilities of individuals where 'issues of fact often are sharply controverted.'"  Nago, 138 Hawai'i at 238, 378 P.3d at 954.

MMK asserts the Commission's decision has "general and future effect" because golf course irrigation will now be classified at the same water duty as "diversified agriculture."

---

[58]    The exception is not applicable here.  See id. (citing HRS § 91-1).

We have already determined, however, that "pursuing the case-by-case evolution of water use policy through adjudicative proceedings" does not constitute illegal rulemaking.  Waiāhole I, 94 Hawai'i at 170-71, 9 P.3d at 482-83.  In Waiāhole I, a golf course owner challenged the Commission's classification of its use as "nonagricultural" because those uses had to meet a more rigid standard.  94 Hawai'i at 168, 9 P.3d at 480.  This court found the classification and resulting higher standard for certain uses did not constitute rulemaking, even though it "may very well precedentially affect future cases."  94 Hawai'i at 169, 9 P.3d at 481.  We determined the Commission did not "propose any general rules automatically applicable in all circumstances, but instead devised a principled solution to a specific dispute based on 'facts applied to rules that have already been promulgated by the legislature.'"  Id.

MMK's appeal in this case is similar to the golf course owner's in Waiāhole I.  The Commission's decision regarding golf courses in both cases may "very well precedentially affect other cases."  See 94 Hawai'i at 169, 9 P.3d at 481.  After this case, it may be the Commission's policy to generally not award golf courses a higher water duty than diversified agriculture, just as after Waiāhole I, the Commission holds nonagricultural uses to a higher standard than agricultural uses.  See 94 Hawai'i at

168, 9 P.3d at 480. But here, like in Waiāhole I, the Commission "devised a principled solution to a specific dispute based on 'facts applied to rules that have already been promulgated by the legislature'" -- the "reasonable-beneficial" standard in the Water Code. See 94 Hawai'i at 169, 9 P.3d at 481 (emphasis added). The Commission properly addressed the specific permit at hand when it determined MMK's use was not "reasonable beneficial."

MMK also argues the Commission engaged in rulemaking because it designated "absolute priorities" between broad categories of water. We disagree. As explained above, the D&O II clearly stated those priorities were not "absolute" but instead were designed to help guide its decision. Prioritizing between competing uses is not rulemaking but a proper exercise of the Commission's duties entrusted by the legislature. See HRS §§ 174C-31 (2011), -49 (2011), -53 (2011).

Because the Commission's water allocation to MMK operates concretely upon MMK in its individual capacity and does not merely affect the rights of individuals in the abstract, the Commission engaged in adjudication, not rulemaking. See Waiāhole I, 94 Hawai'i at 169, 9 P.3d at 481.

###### b. Unlawful policymaking through adjudication

Policymaking by adjudication may still be

> an abuse of discretion if: (1) it is used to "circumvent the requirements of the Administrative Procedure Act" by amending a recently amended rule or by bypassing a pending rule-making proceeding; or (2) "an agency's sudden change of direction leads to undue hardship for those who had relied on past policy."

In re Gas Co., LLC, 147 Hawaiʻi 186, 204, 465 P.3d 633, 651 (2020) (citation omitted).  MMK asserts the second prong applies to this case; MMK claims it "reasonably relied upon" the "reasonable-beneficial" standard and burden of proof established in the Water Code when preparing for and presenting evidence at the contested case hearing, but that the Commission acted inconsistently with the Water Code.

The Commission did not change the "reasonable-beneficial" standard or MMK's burden of proof.  It applied existing standards, including but not limited to assessing MMK's actual water needs, alternative water sources, whether MMK's use was in the public interest, weighing competing uses, and holding MMK's private commercial, nonagricultural use to a higher standard than public trust or agricultural uses.

The Commission also did not make a sudden change of direction regarding its treatment of golf courses.  In Waiāhole I, the Commission subjected golf courses to a higher standard than agricultural uses and imposed conditions on those uses.  94 Hawaiʻi at 168-69, 9 P.3d at 480-81.  Similarly, here, the Commission determined golf courses should not receive more water than diversified agriculture.  The Commission had an existing

92

duty to closely scrutinize MMK's private commercial golf course use where public trust and other competing uses are at stake. The Commission's decision thus did not cause MMK "undue" hardship.

We therefore hold the Commission did not engage in unlawful rulemaking or unlawful policymaking through adjudication when it set MMK's use at the same water duty as diversified agriculture.

3.   **The Commission did not abuse its discretion in denying MMK's request to monitor its water use on a 12-MAV**

Next, MMK argues the Commission abused its discretion in denying MMK's request to monitor MMK's water use based on a 12-MAV because the decision ignores the evidence, is arbitrary and capricious, and is contrary to precedent.

Once again, all parties rely on Waiāhole I.  In Waiāhole I, we vacated the Commission's use of a 12-MAV standard to measure O'ahu leeward permittees' water uses.  94 Hawai'i at 171-72, 9 P.3d at 483-84.  We noted that "[n]o one disputes the variable nature of agricultural water demand and the corresponding need for flexibility."  94 Hawai'i at 171, 9 P.3d at 483. Nevertheless, we held that where the Commission found that "high, consistent base flows 'throughout the year' [were] 'essential' to the stream and estuary ecosystem," the Commission failed to "fulfill its duty to consider the impact of fluctuating diversions on instream base flows and the

93

practicability of adopting specific measures to mitigate this impact." 94 Hawai'i at 171-72, 9 P.3d at 483-84. We remanded for the Commission to consider measures to mitigate the impact of offstream diversions on instream base flows, including "use of a shorter time period over which to measure average usage." 94 Hawai'i at 172, 9 P.3d at 484.

On remand, the Commission retained the 12-MAV. See In re Water Use Permit Apps., Case No. CCH-OA95-1, at 74 (Comm'n on Water Res. Mgmt. Dec. 28, 2021) (Legal Framework, Findings of Fact, and Decision and Order). In its decision, the Commission assessed the possible alternatives to and impacts of the 12-MAV and concluded the "best approach" was to continue to use a 12-MAV, designate variable IIFS, and add water to the streams to meet the amended IIFS. Id. at 120. The Commission noted in relevant part that windward streams are steep and short, and high variability in stream flow is characteristic.[59] Id. at 119.

In this case, the D&O II specified that all Nā Wai 'Ehā "[w]ater permit amounts are issued on a per day basis." The Commission denied MMK's motion for clarification or partial reconsideration requesting the Commission clarify that MMK's SWUP was to be monitored on a 12-MAV. To the contrary, the Commission affirmed it "deliberately did not award any permits

---

[59] The parties appealed the Commission's decision again on other grounds, but Waiāhole II did not address the 12-MAV. See 105 Hawai'i 1, 93 P.3d 643.

based on a 12-MAV in this case" because central Maui is subject to drought conditions, there are numerous users on all the streams, and enforcement of a 12-MAV is "nearly impossible."

Here, as in Waiāhole I, there is no dispute MMK's water needs fluctuate throughout the year, particularly during dry seasons.  But the Commission did not have to employ the same approach that it did on remand in Waiāhole I; the cases involve different streams, water users, and flow patterns.  The Commission's use of per-day water permit amounts appears to be an appropriate measure to protect IIFS and availability of water for other uses in a drought-prone area.  Therefore, we hold the Commission did not abuse its discretion in declining to adopt a 12-MAV.

### 4.	The Commission did not violate MMK's due process rights

Finally, MMK argues the Commission's classification of MMK's use under the same water duty as "diversified agriculture" without adequate notice and meaningful opportunity to be heard on that issue violated its constitutional right to procedural due process.

Article I, Section 5 of the Hawai'i Constitution provides, "No person shall be deprived of life, liberty or property without due process of law."  Amendment XIV, Section 1 of the U.S. Constitution provides that no state shall "deprive any

95

person of life, liberty, or property, without due process of law." This court employs a two-step analysis for procedural due process claims: "(1) is the particular interest which claimant seeks to protect by a hearing 'property' within the meaning of the due process clauses of the federal and state constitutions, and (2) if the interest is 'property,' what specific procedures are required to protect it." Sandy Beach Def. Fund v. City Council of City & Cnty. of Honolulu, 70 Haw. 361, 376, 773 P.2d 250, 260 (1989) (quoting Aguiar v. Haw. Hous. Auth., 55 Haw. 478, 495, 522 P.2d 1255, 1266 (1974)).

MMK received a full contested case hearing with the full gambit of procedural protections for the Hawai'i constitutional property rights it asserted.[60] MMK had a statutory right to a hearing under the Water Code. See HRS § 174C-50(b)[61] (providing for a right to a hearing for SWUPAs for existing uses exceeding

---

[60] To the extent MMK argues it has a right to continue its existing use under its contract with WWC, we emphasize that that no private party has a vested right to continue an existing water use to the detriment of the public because water is a public resource protected by the public trust. See Waiāhole I, 94 Hawai'i at 141, 9 P.3d at 453.

[61] HRS § 174C-50(b) provides in relevant part,

> Whether the existing use is a reasonable-beneficial use and is allowable under the common law of the State shall be determined by the commission after a hearing; provided that the commission may make such a determination without a hearing, if the quantity of water applied for does not exceed an amount per month established by rule or if the quantity of water applied for exceeds an amount per month established by rule, but no objection to the application is filed by any person having standing to file an objection.

25,000 gpd); HAR § 13-171-14 (eff. 1988).[62]  Thus, MMK's SWUPA

was a contested case and the procedural protections of chapter

91 applied to those proceedings.  See HRS § 91-1 (defining a

"contested case" as a "proceeding in which the legal rights,

duties, or privileges of specific parties are required by law to

be determined after an opportunity for agency hearing"); Koʻolau

Agric. Co. v. Comm'n on Water Res. Mgmt. (Koʻolau Ag.), 83

Hawaiʻi 484, 496, 927 P.2d 1367, 1379 (1996) ("At the permitting

stage, the Commission is required to determine the respective

rights of water users; because recognized property interests

could be affected, applicants' due process rights are implicated

and contested case hearings pursuant to HRS chapter 91 are

required.").

Generally,

> [t]he basic elements of procedural due process of law
> require notice and an opportunity to be heard at a

---

[62]    HAR § 13-171-14(b) (eff. 1988) provides,

> Whether the existing use is a reasonable-beneficial use and
> is allowable under the common law of the State shall be
> determined by the commission after a hearing; provided that
> even if the commission finds that the existing use is not
> allowable under the common law of the state, such finding
> of itself shall not constitute a bar to the granting of the
> permit. The commission may make such a determination
> without a hearing, if the quantity of water applied for
> does not exceed 25,000 gallons per month or if the quantity
> of water applied for exceeds said amount per month, but no
> objection to the application is filed by any person having
> standing to file an objection. In determining whether an
> application does not exceed the amount per month set forth
> in this section, the commission shall consider an average
> of water use over the three-month period immediately
> preceding the filing of the application.

> meaningful time and in a meaningful manner before governmental deprivation of a significant property interest. Determination of the specific procedures required to satisfy due process requires a balancing of several factors: (1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail.

Sandy Beach, 70 Hawai'i at 378, 773 P.2d at 261 (cleaned up). HAPA procedures "embody the specific elements of notice and an opportunity to be heard which lie at the heart of all due process guarantees." Aguiar, 55 Haw. at 498, 522 P.2d at 1268 (citing Mortensen v. Bd. of Trs. of Emps.' Ret. Sys., 52 Haw. 212, 221, 473 P.2d 866, 872 (1970)); see also HRS § 91-9 (2012 & Supp. 2021).

Here, the Commission clearly provided MMK with sufficient procedural protections when it held a contested case hearing in which MMK gave testimony and presented evidence, Miike issued a proposed D&O, and the Commission held a hearing on MMK's exceptions to that proposed D&O. Nothing in HAPA requires the Commission to hold a separate hearing specifically on whether MMK's water duty should be set at the same as diversified agriculture, or to notify MMK that it plans to set its water duty at 2,500 gad. See infra Section IV.E.1 (explaining that the Commission can make changes to Miike's proposed D&O and render its final decision without issuing a new proposed decision). Additionally, because the Commission used

98

comprehensive contested case hearing procedures, the risk of erroneous deprivation of MMK's private interest was low. On the other hand, it would be a significant burden for the Commission to have to notify a permit applicant whenever it planned to deviate from the hearing officer's proposal regarding the applicant's allocated water duty or to set an applicant's water duty at the same level as another category of applicant.

We therefore hold the Commission did not violate MMK's due process rights.

## D. Mahi Pono's cross-appeal

### 1. The Commission did not violate Mahi Pono's due process rights

As to Mahi Pono's cross-appeal, Mahi Pono first argues the Commission violated its constitutional right to due process by

> (1) . . . discourag[ing] Mahi Pono from moving to reopen evidence and instead encourag[ing] Mahi Pono to pursue a settlement agreement with the [Hui/MTF]; (2) but then refus[ing] to adopt the settlement agreement that it had encouraged Mahi Pono to pursue; and (3) without providing Mahi Pono an opportunity to present evidence regarding its own farm plan and anticipated water needs, render[ing] a decision based in part on comments made by Mahi Pono at the August 28, 2019 hearing on the Substitution Motion.

For the same reasons, Mahi Pono argues the Commission violated its due process rights in denying Mahi Pono's motion for partial reconsideration.

Hence, Mahi Pono challenges the Commission's final decision as "[i]n violation of constitutional" provisions under HRS § 91-14(g)(1). The constitutional provisions at issue here are

99

Article I, Section 5 of the Hawai'i Constitution and Amendment XIV, Section 1 of the United States Constitution.  Our state constitution provides, "No person shall be deprived of life, liberty or property without due process of law."  The federal constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  The process due to an applicant seeking a surface water use permit is generally notice and a hearing.  See HRS § 174C-50(b) ("After publication . . . the commission shall issue a permit for the continuation of a use in existence on the effective date of designation, if the criteria in subsection (a) are met and the existing use is reasonable and beneficial[, which the commission determines] after a hearing[.]"); HAR § 13-171-14(b) ("Whether the existing use is a reasonable-beneficial use . . . shall be determined by the commission after a hearing[.]").

In this case, it is undisputed that Mahi Pono's predecessor, HC&S, was given notice and an opportunity to be heard on SWUPA 2206 during the contested case hearing.  Mahi Pono, however, argues that, upon its substitution for HC&S, due process required the Commission to either re-open the evidentiary portion of the contested case hearing so that Mahi Pono could present evidence of its farm plan and water needs, or adopt the settlement agreement entered into by Mahi Pono, the Hui/MTF, and OHA in full.  Mahi Pono argues that the Commission

could not determine its water allocation by picking and choosing statements made at the substitution hearing or in the settlement agreement; rather, the Commission should have first given Mahi Pono notice that it would do so.  Specifically, Mahi Pono faults the Commission for relying on statements that (1) the entirety of Mahi Pono's portion of the Waihe'e-Hopoi Fields would be devoted to diversified agriculture, and (2) Well 7 could maintain a running annual average of 4.5 mgd and serve as an additional source of water for Mahi Pono.  Mahi Pono characterizes these statements as "extrajudicial" and "outside the [contested case hearing] record."  Mahi Pono also faults the Commission for arbitrarily not adopting other statements made in the settlement agreement, including its statement that Mahi Pono's portion of the Waihe'e-Hopoi Fields consisted of 3,740 acres; instead, the Commission used a figure of 3,650 acres in its D&O II and in the errata, and multiplied that number by 2,500 gad for diversified agriculture to arrive at Mahi Pono's irrigation needs.

Mahi Pono compares its case to Mauna Kea Anaina Hou v. Board of Land & Natural Resources, 136 Hawai'i 376, 391, 363 P.3d 224, 239 (2015), arguing the Commission made a decision before developing a record on Mahi Pono's farm plan and water needs. In Mauna Kea Anaina Hou, however, the Board of Land and Natural Resources issued a permit to construct the Thirty Meter

101

Telescope in a conservation district, then it granted opponents of the project a contested case hearing. 136 Hawai'i at 380, 363 P.3d at 228. This court held that the approval of the permit before the contested case hearing violated the due process clause of the Hawai'i Constitution. Id.

This case is distinguishable from Mauna Kea Anaina Hou because Mahi Pono was a participant in the contested case hearing. It had been allowed to substitute in for HC&S, a party to the contested case hearing who had received notice and an opportunity to present evidence of its water needs. There is no question the record on SWUPA 2206 had been fully developed as to HC&S. HC&S moved to withdraw from the contested case hearing and substitute in Mahi Pono over two-and-a-half years after the close of the evidentiary portion of the contested case hearing. Miike had already issued his proposed D&O, and any party dissatisfied had had an opportunity to submit objections. HC&S filed no objections. Only closing arguments remained at the time Mahi Pono moved to substitute itself into the proceedings. As the Hui/MTF, OHA, and the Commission argue, Mahi Pono stepped into the shoes of HC&S, who had been given all the process that was due; thus, Mahi Pono received all the process it was due.

Mahi Pono concedes the Commission was not obligated to accept wholesale its stipulated water allocation.[63]  Mahi Pono's issue, then, is properly reframed as whether the state or federal due process clauses required the Commission to re-open the evidentiary portion of a contested case hearing upon the substitution of a party.

The Commission argues that Mahi Pono benefited from stepping into the shoes of HC&S at that point in the proceedings because it did not have to start the process over with a new user application.  The Commission correctly points out that if Mahi Pono "wanted the Commission to hear evidence specifically relating to its needs, it could have started a new use application" under HRS § 174C-51.[64]  Instead, Mahi Pono elected

---

[63]   The Commission notes the settlement agreement "did not contemplate the needs of all parties," and that the Commission "had to account for all interests and could not just passively accept the terms of the Settlement Agreement."  We agree, for the Commission "must not relegate itself to the role of a mere 'umpire passively calling balls and strikes for adversaries appearing before it,'"; rather, the Commission must "consider[], protect[], and advanc[e] public rights in the resource at every stage of the planning and decisionmaking process."  In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Molokai), Inc., 116 Hawaiʻi 481, 490, 174 P.3d 320, 329 (2007).

[64]   HRS § 174C-51 (2011) is titled "Application for a permit."  It states the following:

> All permit applications filed under this part shall contain the following:
>      (1)  The name and address of the applicant and landowner; provided that:
>           (A)  In the event the applicant is an association, organization, partnership, trust, corporation, or any other legal entity doing business in Hawaii, the address of its principal place of business shall be stated in the application; and

(continued. . .)

to skip the line and insert itself in the current contested case proceeding.  The Commission also correctly pointed out that Mahi Pono could have sought a modification of SWUP 2206, once it was granted on HC&S's record, under HRS § 174C-57.[65]

---

> (B)  In the event a lessee, licensee, developer, or any other person with a terminable interest or estate in the land, which is the water source of the permitted water, applies for a water permit, the landowner shall also be stated as a joint applicant for the water permit;
>> (2)  The date of application;
>> (3)  The water source of the water supply;
>> (4)  The quantity of water requested;
>> (5)  The use of the water and any limitations thereon;
>> (6)  The location of the use of water;
>> (7)  The location of the well or point of diversion; and
>> (8)  Such other relevant information that the commission may request from time to time.
>
> The commission in its discretion may allow a person to apply for several related withdrawals in the same application for a water permit.

HRS § 174C-51.

[65]  HRS § 174C-57 is titled "Modification of permit terms" and provides the following:

> (a)  A permittee may seek modification of any term of a permit.  A permittee who seeks to change the use of water subject to the permit, whether or not such change in use is of a material nature, or to change the place of use of the water or to use a greater quantity of water than allowed under the permit or to make any change in respect to the water which may have a material effect upon any person or upon the water resource, shall make application pursuant to section 174C-51 in respect to such a change.  Modification of one aspect or condition of a permit may be conditioned on the permittee's acceptance of changes in other aspects of the permit.
>
> (b)  All permit modification applications shall be treated as initial permit applications and be subject to sections 174C-51 to 174C-56; except that if the proposed modification involves an increase in the quantity of water not exceeding an average amount per month to be established by rule, the commission, at its discretion, may approve the proposed modification without a hearing provided that the permittee establishes that:

(continued. . .)

104

Thus, there were procedures Mahi Pono could have followed, short of re-opening the evidentiary portion of the contested case hearing, to have its farm plan and water needs considered because they differed from those of HC&S. The Commission therefore did not violate Mahi Pono's state or federal due process rights in deciding Mahi Pono's water allocation in this case without re-opening the evidentiary portion of the contested case hearing.

As to the statements the Commission relied upon that Mahi Pono asserts were outside of the evidentiary record, this case is distinguishable from those cited by Mahi Pono because Mahi Pono itself made the statements to the court, in the substitution hearing and the settlement agreement it submitted to the court. See Mauna Kea Power Co. v. Bd. Of Land & Nat. Res., 76 Hawai'i 259, 262, 874 P.2d 1084, 1087 (1994) (stating that where agencies consult sources outside the record, "the right of a party to cross-examine those sources and present

---

(1) A change in conditions has resulted in the water allowed under the permit becoming inadequate for the permittee's needs; or

(2) The proposed modification would result in a more efficient utilization of water than is possible under the existing permit.

(c) County agencies are exempt from the requirements of this section except where the modification involves a change in the quantity of water to be used or where the new use would adversely affect the quality of the water or quantity of use of another permittee.

rebuttal evidence is violated"); State, Off. Of Mgmt. & Budget v. Pub. Emp. Rels. Bd., C.A. No. 09A-08-012 CLS., 2011 WL 1205248 (Del. Mar. 29, 2011) (holding the agency director committed an error of law by taking administrative notice of facts obtained on the state's website that were outside the record without first giving the parties notice and an opportunity to be heard).  A party who makes a statement to a court or agency cannot later claim a due process violation when the court or agency relies on that statement.

Thus, we reject Mahi Pono's due process argument.

2.   **The process by which the Commission arrived at Mahi Pono's water allocation, however, is not reasonably clear**

Mahi Pono alternatively argues that the Commission's decision-making process contained flaws (short of constitutional violations) justifying reversal and/or modification. Specifically, Mahi Pono argues that there are two other bases in HRS § 91-14(g) for reversing or modifying the Commission's D&O, as amended by the errata.  First, the Commission's decision was "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record."  HRS § 91-14(g)(5) (2012).  Second, the Commission's decision was "[a]rbitrary, or capricious, or characterized by abuse of discretion of clearly unwarranted exercise of discretion."  HRS § 91-14(g)(6) (2012).

To Mahi Pono, the Commission clearly erred in reaching its decision because the statements it relied on were not part of the evidentiary portion of the contested case hearing. We have already rejected this argument because the statements Mahi Pono made about its diversified agriculture plans were not "outside" the record in this case.

As to how the Commission's final decision was "arbitrary or capricious," Mahi Pono argues that the Commission arbitrarily rejected the settlement agreement's figure of 3,740 acres for Mahi Pono's portion of the Waiheʻe-Hopoi Fields, on one hand, but accepted the settlement agreement's figure of 4.5 mgd for Well 7's irrigation capacity, on the other hand. To the extent the Commission used statements from the substitution hearing and the settlement agreement as evidence, it must provide some reasons as to how it used that evidence to determine Mahi Pono's water allocation. See Waiāhole I, 94 Hawaiʻi at 157, 9 P.3d at 469 (requiring an agency's findings to be "reasonably clear").

These reasons are absent from the initial D&O and the erratum. Even OHA and the Hui/MTF, who seem to generally agree with the ultimate allocation of water to Mahi Pono, nevertheless criticize the Commission for not "fulfill[ing] its basic function as a decisionmaker to indicate in its final decision whether and how it actually exercised its discretion in considering the proposed settlement." They continue, "Here,

CWRM's final decision included no FOFs and COLs addressing the proposed settlement. Indeed, it did not even include any acknowledgement that the settlement existed, or any indication whether CWRM had actually considered it, or potentially had just forgotten about it."

OHA and the Hui/MTF are correct. Worse, as Mahi Pono points out, the Commission's initial D&O seems to allocate water to HC&S for bioenergy crops, not to Mahi Pono for diversified agriculture. In FOF 480, the Commission traced the history of SWUPA 2206, from HC&S's initial application in April 2009 requesting 36.29 mgd for 4,408 acres of the Waihe'e-Hopoi Fields; through the 2014 Mediated Agreement allocating HC&S 21.75 mgd for 3,650 acres of the Waihe'e-Hopoi Fields; through HC&S's current amended request for 17.43 mgd for 3,650 acres of the Waihe'e-Hopoi Fields after announcing it was transitioning from sugar cane to bioenergy grasses. In a footnote, the Commission acknowledged that HC&S withdrew from the contested case hearing and Mahi Pono was substituted in as the SWUPA 2206 applicant. The Commission continued, "It is assumed that HC&S's projected future uses remain the same for Mahi Pono."

That finding is clearly erroneous, as Mahi Pono made it clear in the substitution hearing and settlement agreement that it would be engaging in diversified agriculture, not bioenergy. Sub-finding of fact 480(j) is also clearly erroneous for the

same reason.  It states, "Mahi Pono plans to have a mix of bioenergy crops that will be rotated over the course of a few seasons."  It appears the Commission had forgotten about Mahi Pono's planned use of diversified agriculture and had forgotten about the settlement agreement.

Thus, as Mahi Pono argues, the Commission's findings in the initial D&O, as to Mahi Pono, are not "reasonably clear" under Waiāhole I, 94 Hawai'i at 157, 9 P.3d at 469.  Thus, a reviewing court would not be able to "judge the propriety of agency action solely by the grounds invoked by the agency," because the basis of the agency's reasoning is not "set forth with such clarity as to be understandable."  94 Hawai'i at 163, 9 P.3d at 475.

The Commission's erratum does not cure the deficiency in the initial D&O.  Although the erratum seems to correct the Commission's initial error (by allocating water to Mahi Pono instead of to HC&S), it nonetheless omits any reasons for (1) calculating Mahi Pono's irrigatable land acreage as 3,650 rather than 3,740, and (2) calculating Well 7's irrigation capacity as 4.5 mgd rather than 3.0 mgd.  Thus, the erratum likewise suffers from a lack of clarity, which prevents this court from judging the propriety of Mahi Pono's water allocation.  See Waiāhole I, 94 Hawai'i at 163, 9 P.3d at 475.

Therefore, as to Mahi Pono's appeal, we remand the D&O, as amended by the erratum, to the Commission so that it can make

specific findings as to why the number of acres Mahi Pono will use for diversified agriculture is 3,650 instead of 3,740, and why Well 7's irrigation capacity is 4.5 versus 3.0 mgd.

## E. WWC's cross-appeal

Finally, WWC cross-appeals, raising a number of points of error regarding the Commission's procedures, authority, and jurisdiction. We reject all but one.

### 1. The Commission did not violate WWC's due process rights

WWC asserts the Commission violated its due process rights by not complying with the procedural protections of HRS chapter 91 and applicable administrative rules.[66] We disagree.

#### a. Proposed decision and/or findings

WWC concedes it received all the required procedural protections through the course of the contested case hearing, Miike's proposed D&O, filing exceptions to that proposed D&O, and presenting argument on those exceptions. WWC appears to argue that pursuant to HRS § 91-11, the Commission thereafter should have issued its "own" proposed findings (separate from Miike's) because the Commission made "wholesale" changes to Miike's proposed findings,[67] and that WWC should have had another

---

[66]    WWC does not raise a constitutional due process argument.

[67]    The Hui/MTF and OHA maintain that the Commission did not even make any changes to Miike's proposed "findings" other than to substitute "Mahi Pono" for "HC&S." Even if WWC intended to refer to all the Commission's changes to Miike's proposed water allocations, not just his proposed "findings," WWC's argument fails for the reasons explained below.

110

opportunity to file exceptions and present argument on those exceptions.

As explained above, because HRS § 174C-50 and HAR § 13-171-14 provide for a right to a hearing for SWUPAs for existing uses exceeding 25,000 gpd, the procedural protections for contested cases under chapter 91 apply. See HRS § 91-1 (defining a "contested case" as a "proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing"); Waiāhole I, 94 Hawai'i at 119 n.15, 9 P.3d at 431 n.15.

HRS § 91-11 (2012) provides for the issuance of a proposed decision and the opportunity to file exceptions and present argument on those exceptions:

> Whenever in a contested case the officials of the agency who are to render the final decision have not heard and examined all of the evidence, the decision, if adverse to a party to the proceeding other than the agency itself, shall not be made until a proposal for decision containing a statement of reasons and including determination of each issue of fact or law necessary to the proposed decision has been served upon the parties, and an opportunity has been afforded to each party adversely affected to file exceptions and present argument to the officials who are to render the decision, who shall personally consider the whole record or such portions thereof as may be cited by the parties.

HAR § 13-167-63(a) (eff. 1988) provides in part, "Where a hearing officer has conducted the hearing, the hearing officer shall file . . . proposed findings of facts and conclusions of law which the commission may adopt, reject, or modify." (Emphases added.)

111

In White v. Bd. of Educ., 54 Haw. 10, 501 P.2d 358 (1972),[68] "we held that a hearing officer's report could serve as the agency's proposed decision under HRS § 91-11." Cariaga v. Del Monte Corp., 65 Haw. 404, 408, 652 P.2d 1143, 1146 (1982). The "general rule is that if an agency making a decision has not heard the evidence, it must at least consider the evidence produced at a hearing conducted by an examiner or a hearing officer." 54 Haw. at 13, 501 P.2d at 361 (citations omitted). We held the procedure in White satisfied the requirements of HRS § 91-11. 54 Haw. at 13-14, 501 P.2d at 361-62.

Here, Miike issued his proposed D&O, WWC filed exceptions to it, WWC presented arguments on those exceptions before the Commission, and the Commission modified the proposed decision in rendering its final decision. That procedure complied with HRS § 91-11 and HAR § 13-167-63(a). The plain language of HAR § 13-167-63 provides for the hearing officer, if applicable, to issue proposed FOFs and COLs and expressly authorizes the Commission to modify that proposal; neither HAR § 13-167-63 nor HRS § 91-11 requires the Commission to issue additional proposed FOFs and COLs before rendering its final decision. Thus, like the hearing officer's proposed decision in White, which we held was sufficient to satisfy HRS § 91-11, here, Miike's proposed D&O

---

[68] HRS § 91-11 has not been revised since White.

was sufficient to satisfy HRS § 91-11.  See White, 54 Haw. at 14, 501 P.2d at 362; see also HAR § 13-167-24(d) (eff. 1988) ("Each hearings officer is deemed to be an agent of the commission with all powers associated with such designation.").

To the extent that WWC argues that the Commission must issue new proposed findings before issuing the final because it made "wholesale" changes to Miike's proposed findings, that argument also fails.  Nothing in the plain language or purpose of HRS § 91-11 or HAR § 13-167-63(a) requires multiple proposed decisions when there are material changes to the initial proposed decision and/or findings.  And we agree with the Hui/MTF and OHA that such a requirement would create an absurd cycle not required to satisfy due process.

### b.   Time limits to render a final decision

Next, WWC argues the Commission failed to comply with applicable time limits to render a decision.  WWC cites HAR § 13-167-63(b),[69] which states the Commission "shall" render a final decision within 90 days of holding a contested case hearing.[70]

---

[69]   HAR § 13-167-63(b)(eff. 1988) provides in relevant part, "(b) Within ninety days after the hearing, the commission shall render its findings of fact, conclusions of law and decision and order approving the proposal denying the proposal, or modifying the proposal by imposing conditions."

[70]   HRS §§ 174C-50(d) and -53(c) (2011) both also provide that the Commission "shall" act upon permit applications "within one hundred eighty calendar days" of applications requiring hearings.

Waiāhole I disposes of WWC's argument.  In Waiāhole I, we rejected the City and County of Honolulu's ("the City") procedural objection to the Commission granting petitions to amend the IIFS after the expiration of the statutory time limit. 94 Hawai'i at 152, 9 P.3d at 464.  In that case, the Commission entered an order extending its time to issue a decision "until such time as the commission is able to act on the merits of the applicants and petitions."  Id.  On review, we explained that although the Water Code imposes a deadline on decisions regarding IIFS and WUPAs, the City's argument failed in part because the City did not point to any objection in the record to the Commission's order extending its time limits.  Id. (citing HRAP Rule 28(b)(4) (2000)).  Additionally, we stated the City did not object "to the Commission's prior decision to consolidate the proceedings for the petitions to amend the IIFS and the water use permit applications, which should have placed all parties on notice that the respective time limits probably would not be met."  Id.

Here, the Commission clearly did not comply with the statutory and administrative rule time requirements.  It held a contested case hearing in 2016 and did not issue a final decision until 2021.  However, like the City in Waiāhole I, WWC does not point to anywhere in the record they objected to the

114

Commission's procedures below.  See HRAP Rule 28(b)(4).[71]

Additionally, WWC did not object to the Commission consolidating

its case with the IIFS, and under Waiāhole I, WWC was on notice

that the Commission would probably not meet the 90-day time

limit.  Thus, WWC's argument regarding the statutory time limits

is waived.

### c.  Ruling on WWC's exceptions

WWC also contends the Commission failed to comply with HAR

§ 13-167-63(c) because it did not address the objections WWC

raised to Miike's proposed findings.[72]  WWC is wrong.

HAR § 13-167-63(c) (eff. 1988) provides,

> Every decision and order adverse to a party to the
> proceeding, rendered by the commission in a contested case,
> shall be in writing or stated in the record and shall be
> accompanied by separate findings of fact and conclusions of
> law.  If any party to the proceeding has filed proposed
> findings of fact, the commission shall incorporate in its
> decision a ruling upon each proposed finding so presented.

---

[71]   HRAP Rule 28(b)(4) provides in relevant part,

> [T]he appellant shall file an opening brief,
> containing . . . :
> . . . .
> (4) A concise statement of the points of error . . .
> . Each point shall state: . . . (iii) where in the record
> the alleged error was objected to or the manner in which
> the alleged error was brought to the attention of the court
> or agency. . . .
> Points not presented in accordance with this section
> will be disregarded[.]

[72]   WWC objected to the following three aspects of Miike's proposed D&O:
(1) COLs 79 and 84, which stated appurtenant rights are not subject to
reservation by deed; (2) Miike's proposed increase of the Waihe'e River IIFS
from 10 mgd to 14 mgd; and (3) paragraphs 40, 50, 51, and 52 of Miike's
proposed order based on their unlawful delegation argument.

115

See also HRS § 91-12 (2012) (requiring the same).

This argument fails at the outset because, as the Hui/MTF and OHA point out, HAR § 13-167-63(c) does not require the Commission to address each of the parties' exceptions to the proposed decision. Rather, it requires the Commission to address the parties' own proposed findings.[73]

In sum, WWC's procedural due process arguments fail.

## 2. The Commission unlawfully delegated its discretionary decision-making authority to WWC

Next, WWC asserts the Commission unlawfully delegated its authority to allocate water between users and create water shortage plans to WWC and, to a lesser extent, Mahi Pono. The Hui/MTF and OHA agree with this point of error as to delegation of the Commission's authority to allocate water and balance water needs under the public trust.

---

[73] The introduction to the D&O II includes a paragraph broadly addressing the parties' proposed FOFs. It states,

> FOF that have been proposed by the parties but not incorporated in this D&O have been excluded because they may be duplicative, not relevant, not material, taken out of context, contrary (in whole or in part) to the found facts, an opinion (in whole or in part), contradicted by other evidence, or contrary to law. Proposed FOF that have been incorporated may have modifications or corrections that do not substantially alter the meaning of the original proposed findings.

That paragraph appears to be sufficient to satisfy HRS § 91-12 and HAR § 13-167-63(c). See In re Conservation Dist. Use. App. HA-3568 (In re TMT), 143 Hawai'i 379, 408-09, 431 P.3d 752, 781-82 (2019) (holding the agency satisfied HRS § 91-12's requirements through the inclusion of a substantially similar paragraph in the introduction to the agency decision).

We agree that, on its face, the D&O II unlawfully delegates to WWC and Mahi Pono the allocation of water during water shortages, but do not agree the Commission delegated its duty to create water shortage plans.

An "agency of the State must perform its statutory function in a manner that fulfills the State's affirmative constitutional obligations. The State's affirmative duty to protect and preserve constitutional rights is by its very nature not delegable to a private entity." Lāna'ians for Sensible Growth v. Land Use Comm'n, 146 Hawai'i 496, 506-07, 463 P.3d 1153, 1163-64 (2020) (first citing Mauna Kea Anaina Hou, 136 Hawai'i at 414, 363 P.3d at 262 (opinion of the court as to Part IV by Pollack, J.); and then citing Ka Pa'akai, 94 Hawai'i at 50-51, 7 P.3d at 1087-88). As explained in previous sections, the State has an affirmative duty under the Hawai'i Constitution to protect Hawai'i's water resources and balance between competing water needs under the public trust doctrine, and to protect traditional and customary Native Hawaiian rights. See supra Section IV.A; Haw. Const. art. XI, §§ 1 (public trust doctrine), 7 (protection of water resources); Haw. Const. art. XII, § 7 (protection of traditional and customary rights).

The Hui/MTF and OHA again cite Ka Pa'akai as directly analogous. In Ka Pa'akai, we held, inter alia, that the LUC

117

improperly delegated its duty to protect Native Hawaiian rights to a private developer. 94 Hawai'i at 50-52, 7 P.3d at 1087-89. The LUC had included as a condition to granting the developer's petition for land use boundary amendments that the developer must "preserve and protect any gathering and access rights of native Hawaiians who have customarily and traditionally exercised subsistence, cultural and religious practices on the subject property." 94 Hawai'i at 50, 7 P.3d at 1087. We rejected this condition as an improper "wholesale delegation of responsibility for the preservation and protection of native Hawaiian rights" to a private entity, and declared the agency must address these protections before taking action. Id. We emphasized that

> [t]he power and responsibility to determine the effects on customary and traditional native Hawaiian practices and the means to protect such practices may not validly be delegated by the LUC to a private petitioner who, unlike a public body, is not subject to public accountability. Allowing a petitioner to make such after-the-fact determinations may leave practitioners of customary and traditional uses unprotected from possible arbitrary and self-serving actions on the petitioner's part.

94 Hawai'i at 52, 7 P.3d at 1089.

In this case, the Commission's decision and order provided that

> sufficient flows must be added for permittees and domestic users downstream of the IIFS locations. This will be a particularly difficult task with IIFs located where there are also substantial numbers of upstream as well as downstream permittees and domestic users, because WWC and to a lesser extent, Mahi Pono, must maintain a balance between upstream and downstream users while meeting the

> <u>IIFS for instream purposes</u>. Moreover, when stream flows
> are insufficient to meet the permitted amounts, <u>WWC and
> Mahi Pono must reduce available water for downstream
> permittees at identified delivery points equitably
> according to the permittees' priority</u>.

(Emphasis added.)

As mentioned <u>supra</u>, the D&O II also stated, "[t]he flows established below the diversions shall be augmented by the amounts necessary to meet the requirements of downstream water-use permittees and domestic uses." But it is not clear whether such "augmenting" is to be done in the future, and if so, by whom.

The Commission argues it did not unlawfully delegate its duties to allocate water to WWC and Mahi Pono because the private parties do not have discretion; they must follow the final decision, including the tables within that specify how WWC must allocate water amongst permittees at various levels of stream flow.

The charts in the D&O II that show how the water is to be reduced among various groups of water uses, but not between individual applicants. Further, the Commission's direction to WWC (and Mahi Pono) to "maintain a balance" between upstream and downstream users and reduce available water for downstream permittees "equitably according to the permittees' priority," are an unlawful delegation of the Commission's responsibility to do this balancing and protect downstream users' water rights.

119

It is the Commission's nondelegable duty to balance upstream and downstream users and make the determination of how to "equitably" reduce water between permittees when stream flows are low. Moreover, in this case, many downstream users are loʻi kalo growers and other users exercising their traditional and customary rights, which the Commission has an affirmative duty to protect. See Haw. Const. art. XI, § 7; id. art. XII, § 7.

The Commission's direction to reduce water among applicants "according to priority" is insufficient because it still leaves significant discretion in the hands of the private parties. The priority lists created by the Commission are broad,[74] and under the D&O II, WWC and Mahi Pono could still choose how to "equitably" distribute within and amongst the priority groups. The provision leaves too much discretion within the hands of private parties where constitutionally protected rights and public trust resources are at stake.

The Commission also cites the D&O II's provision that WWC may consult with Commission staff regarding the reduction of water shortages "for clarification and guidance to avoid any discretionary decisions." That provision is insufficient to guard against delegation. Like the LUC in Ka Paʻakai, the

---

[74] As noted supra, the Commission's priority list includes four broad categories: (1) Native Hawaiian traditional and customary practices and domestic uses, (2) appurtenant rights, (3) existing uses, and (4) new uses.

Commission must address protections for downstream permittees before taking action. See 94 Hawai'i at 50, 7 P.3d at 1087. And the provision still vests discretion with WWC concerning whether or not to consult the Commission.

WWC has an inherent self-interest in prioritizing its paying customers at the expense of other permittees. Allowing WWC and/or Mahi Pono to decide how to "balance" and "equitably" distribute water amongst users when stream flows are low, and when to consult the Commission for further direction, may leave downstream users unprotected from self-serving actions on the part of WWC. See Ka Pa'akai, 94 Hawai'i at 52, 7 P.3d at 1089.

WWC also contends the Commission unlawfully delegated its duty under the Water Code to create water shortage plans. We do not agree as to the water shortage plans.

HRS § 174C-62(a) (2011) and HAR § 13-171-42(a) (eff. 1988) provide in identical part that "[t]he commission shall formulate a plan for implementation during periods of water shortage." HAR § 13-171-42(c) (eff. 1988) goes on to provide that "[a]ll permittees, unless exempted by the commission, shall submit a water shortage plan outlining how it will reduce its own water use in case of a shortage. Every water shortage plan shall be subject to approval or modification by the commission."

Here, the Commission's D&O II established the following condition applicable to all SWUPs: "As required by HAR § 13-

171-42(c), the permittee shall submit a water shortage plan outlining how it will reduce its water use in case the Commission declares a water shortage."  So long as the Commission independently assesses the proposed water shortage plans upon submission, the directive to all permittees to "submit" water shortage plans is not an unlawful delegation. See In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Molokai), Inc., 116 Hawai'i at 490, 174 P.3d at 329 (stating the Commission "must not relegate itself to the role of a mere 'umpire passively calling balls and strikes for adversaries appearing before it'").

Finally, WWC argues the Commission's alleged delegations are based on various assumptions about WWC's ability to control and allocate water that are not supported by FOFs.  We disagree. Numerous FOFs in the Commission's D&O II address WWC's existing distribution system, its control over various ditches and pipes for water allocation, and its related water level monitoring systems;[75] WWC does not challenge those FOFs on appeal.  WWC sought a SWUP for system losses to effectuate its commercial water deliveries through which it controls the water delivery system for its private gain, but now protests it doesn't have

---

[75] For example, FOF 130 states, "WWC controls the Spreckels Ditch from its intake on Waiheʻe River to Mahi Pono's intake at South Waiehu Stream."  FOF 94 refers to WWC's ʻĪao Stream diversion.

sufficient control over the delivery system to effectuate deliveries to nonpaying customers. WWC seeks to have its cake and eat it too.

In sum, we hold the Commission's directive to WWC and Mahi Pono to "balance" between upstream and downstream users and reduce available water for downstream users "equitably according to the permittees' priority" is an unlawful delegation of the Commission's responsibility to do that balancing and protect downstream users' water rights. The Commission's directive to the permittees to submit water shortage plans, on the other hand, is not.

### 3. The Commission did not err by not addressing the Public Utility Commission's "overlapping" jurisdiction

Next, WWC asserts the Commission erroneously failed to consider the PUC's expertise over WWC's operational matters, and that the Commission was obligated to address in its final decision how and why the Commission has jurisdiction to mandate operational controls over WWC's water delivery system, in contrast to the PUC.[76] WWC specifically contends that "nothing

---

[76] The Commission and the Hui/MTF and OHA both argue WWC waived this point. WWC did not raise the point in their exceptions to Miike's proposed D&O here; however, they did state in 2009 objections that "[w]hile th[e] Commission has jurisdiction over the issuance and modification of water use permits, the PUC will have jurisdiction over the operations of [WWC], including, but not limited to, areas of service, delivery rates, and other matters." Jurisdiction may be raised at any time. See Adams v. State, 103 Hawaiʻi 214, 221, 81 P.3d 394, 401 (2003) ("[Q]uestions regarding subject matter jurisdiction may be raised at any stage of a cause of action."). In any case, WWC's argument fails for the reasons explained below.

in HRS chapter 174C suggests that the Commission can direct WWC to expend capital to monitor users or to construct a system for delivery to users."  We disagree.

Under section 174C-7(a) (2011) of the Water Code, the Water Commission has "exclusive jurisdiction and final authority in all matters relating to the implementation and administration of the state water code" (except as otherwise provided).  We have repeatedly affirmed the Commission's broad authority and duty to regulate the state's water resources under the Water Code and public trust.  See, e.g., Waiāhole I, 94 Hawai'i at 135, 174-75, 9 P.3d at 447, 486-87 (holding the Commission has the authority to regulate the ditches as a consolidated, unified system).  Moreover, as explained further in the next section, HRS § 174C-31(j) (2011) provides that the Commission "shall condition [water use] permits . . . in such a manner as to protect instream flows and maintain sustainable yields of ground water established under this section."  Thus, we disagree with WWC's argument that "nothing in HRS Chapter 174C suggests that the Commission can direct WWC to expend capital to monitor users or to construct a system for delivery to users." See also Waiāhole I, 94 Hawai'i at 183-86, 9 P.3d at 495-98 (rejecting permittees' challenges to conditions in the Commission's decision that mandated they contribute to stream studies and monitoring activities).

The jurisdiction of the PUC is governed by HRS chapter 269. HRS § 269-6(a) (Supp. 2021), provides in part, "The public utilities commission shall have the general supervision hereinafter set forth over all public utilities, and shall perform the duties and exercise the powers imposed or conferred upon it by this chapter."[77]  The legislature expressly declined

---

[77]     Section 269-1 (2020) defines a "public utility" in relevant part as

> every person who may <u>own, control, operate, or manage</u> as owner, lessee, trustee, receiver, or otherwise, whether under a franchise, charter, license, articles of association, or otherwise, <u>any plant or equipment, or any part thereof, directly or indirectly for public use</u> for the transportation of passengers or freight; for the conveyance or transmission of telecommunications messages; for the furnishing of facilities for the transmission of intelligence by electricity within the State or between points within the State by land, water, or air; <u>for the production, conveyance, transmission, delivery, or furnishing of</u> light, power, heat, cold, <u>water</u>, gas, or oil; for the storage or warehousing of goods . . . .

(Emphases added.)  Section 269-1 goes on to expressly exclude certain persons from the definition "public utility"; none of those provisions appear to be applicable here.  <u>See</u> HRS § 269-1.

Section 269-7(a) (2020) further lays out the PUC's powers over public utilities:

> The public utilities commission and each commissioner shall have power to examine into the condition of each public utility, the manner in which it is operated with reference to the safety or accommodation of the public, the safety, working hours, and wages of its employees, the fares and rates charged by it, the value of its physical property, the issuance by it of stocks and bonds, and the disposition of the proceeds thereof, the amount and disposition of its income, and all its financial transactions, its business relations with other persons, companies, or corporations, its compliance with all applicable state and federal laws and with the provisions of its franchise, charter, and articles of association, if any, its classifications, rules, regulations, practices, and service, and all matters of every nature affecting the relations and transactions between it and the public or persons or corporations.

to limit the jurisdiction of other agencies even where the PUC has jurisdiction.  See HRS § 269-15(a) (2020 & Supp. 2021);[78] see also Pac. Lightnet, Inc. v. Time Warner Telecom, Inc., 131 Hawaiʻi 257, 274, 318 P.3d 97, 114 (2013) (holding the PUC's statutory authority did not deprive the circuit court of jurisdiction in areas where jurisdiction could overlap).

Hence, even if WWC is a "public utility," the Commission has broad jurisdiction over WWC's water use and has a continuing duty to monitor WWC's water use under the public trust.  See HRS § 174C-7(a); Ching v. Case, 145 Hawaiʻi 148, 170, 449 P.3d 1146, 1168 (2019) (holding the state's duty to protect and preserve trust property includes an ongoing obligation to reasonably monitor a third party's use of the property).

Finally, we address WWC's argument that the Commission should have, at minimum, expressly addressed the PUC's potentially overlapping jurisdiction in its final decision.  "An agency can recognize other agencies' overlapping jurisdiction and their expertise in specific subject matters."  In re Maui

---

[78]     Section 269-15(a) provides,

>    The [public utilities] commission may examine into any of the matters referred to in section 269-7, notwithstanding that the same may be within the jurisdiction of any court or other body; provided that this section shall not be construed as in any manner limiting or otherwise affecting the jurisdiction of the court or other body.

HRS § 269-15(a).

Elec. Co. (MECO), 150 Hawaiʻi 528, 541, 506 P.3d 192, 205 (2022).[79]  Under the circumstances of this case, however, it would be illogical to require the Commission to enter findings on the PUC's "overlapping" jurisdiction over WWC's operations, given that the PUC has not yet determined whether WWC is a "public utility" subject to its jurisdiction.[80]

Therefore, the Commission did not err by not addressing the PUC's potential "overlapping" jurisdiction.

### 4.     The other directives and/or conditions attached to WWC's SWUPA are not erroneous

Finally, in several points of error, WWC challenges various other conditions and/or directives in the D&O II, including that WWC must (1) install, use, monitor, and measure water flow within its delivery system by approved devices at each stream

---

[79]     WWC cited MECO for the proposition that an agency can "and should" recognize other agencies' overlapping jurisdiction and subject matter expertise.  (Emphasis added.)  This is a misrepresentation of the case.  In MECO, a community group challenged the PUC's approval of a power purchase agreement.  150 Hawaiʻi at 531-32, 506 P.3d at 195-96.  It argued in part that the PUC's recognition of other agencies' "overlapping jurisdiction" concerning the related project, and particularly its conclusion that those agencies would make permitting decisions based on their respective expertise and statutory and constitutional mandates, constituted an improper delegation of the PUC's public trust obligations.  150 Hawaiʻi at 541, 506 P.3d at 205.  On review, we rejected that argument.  Id.  We stated that the PUC's "comment about further oversight mechanisms over the [p]roject's construction and operation was 'outside and in addition to' its public trust responsibilities; it [did] not amount to an improper delegation."  Id. (citing In re TMT, 143 Hawaiʻi at  397–98, 431 P.3d at 770–71).  Nowhere did we state that an agency "should" acknowledge other agencies' potential overlapping jurisdiction, or that any possible overlap needs to be expressly addressed in every agency decision.

[80]     WWC concedes the PUC suspended proceedings of its own case concerning WWC's status until resolution of this case.

127

diversion location and distribution point; (2) deliver stated quantities of water to distribution points; (3) conduct water audits of its delivery system annually to determine system losses or make monthly reports to the Commission; (4) abandon four inactive stream diversion structures; and (5) reestablish a delivery system to pre-2011 kuleana users of the North Waiehu ditch system who did not apply for or receive SWUPs.

As explained above, the Commission has broad jurisdictional powers over all matters related to the implementation and administration of the Water Code. See HRS § 174C-7(a). Additionally, HRS § 174C-31(j) expressly mandates the Commission condition water use permits "in such a manner as to protect instream flows . . . established under this section." To the extent WWC argues the Commission's conditions and/or mandates were not within the Commission's "jurisdictional powers," that argument fails. Requiring the installation, use, monitoring, and measurement of water flows within WWC's delivery system via approved devices, as well as annual audits or monthly reports, are valid conditions that protect instream flows by ensuring compliance with the D&O II. Requiring WWC to abandon four inactive stream diversion structures and to deliver stated quantities of water to specified distribution points also

protects instream flows by preventing unauthorized diversions and unnecessary system losses.[81]

WWC relies on Nollan v. California Coastal Commission, 483 U.S. 825 (1987), and Dolan v. City of Tigard, 512 U.S. 374 (1994), to argue that any conditions the Commission attaches to its SWUP for system losses must relate to those losses. WWC attempts to frame Nollan and Dolan as providing a "clear statement of the unconstitutional conditions doctrine," but fails to specify which constitutional provisions the conditions violate and of which constitution. Nollan and Dolan specifically apply to takings claims.[82] WWC is not asserting a taking. Thus, WWC's reliance on them necessarily fails.[83]

---

[81] The final condition challenged by WWC regarding the kuleana users of the North Waiehu ditch system is addressed later in this section.

[82] In Nollan and Dolan, the U.S. Supreme Court developed a test for when conditions that government agencies attach to development permits constitute "takings" requiring just compensation under the Fifth Amendment to the U.S. Constitution; together, they established the government's conditions must have an "essential nexus" with and "rough proportionality" to the impacts of the proposed development. See Nollan, 483 U.S. at 831, 837; Dolan, 512 U.S. at 391. See generally Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 605-06 (2013) (summarizing the Nollan/Dolan test).

[83] Even if WWC was asserting a taking (it is not), this court has already rejected the applicability of Nollan and Dolan to water permit conditions in Waiāhole I. In that case, SWUP permittees challenged provisions in the Commission's decision mandating that they contribute to stream studies and monitoring activities as amounting to unconstitutional "regulatory leveraging" in violation of the Fifth Amendment to the U.S. Constitution and Article I, Section 20 of the Hawai'i Constitution. 94 Hawai'i at 184, 9 P.3d at 496. This court stated the analogy between land development exactions and the water permit condition and "fail[ed] at the outset" because whereas Nollan and Dolan involved "regulation of fee simple interests in real estate under the police power," Waiāhole I involved "management of usufructuary interests in water." Waiāhole I, 94 Hawai'i at 184-85, 9 P.3d at 496-97. Because water is "a state public trust resource to which no individual can

(continued. . .)

Of course, the Commission cannot condition SWUPs on anything it wishes; as WWC states, those conditions must relate to the Commission's jurisdictional powers. That is the applicable limit on the Commission's powers – not <u>Nollan</u> and <u>Dolan</u>. And as explained above, the conditions here are within the Commission's broad jurisdictional powers to implement and administer all aspects of the Water Code.[84]

---

claim exclusive right," the State was not "taking" anything. <u>Id.</u> (citing Joseph L. Sax, <u>The Constitution, Property Rights and the Future of Water Law</u>, 61 U. Colo. L. Rev. 257, 280 (1990)). The conditions WWC challenges involve "management of usufructuary interests in water." <u>See</u> <u>id.</u> Thus, WWC's <u>Nollan</u> and <u>Dolan</u> argument also "fails at the outset" under <u>Waiāhole I</u>. <u>See</u> <u>Waiāhole I</u>, 94 Hawai'i at 184-85, 9 P.3d at 496-97.

[84] Although not raised as a point of error, WWC further suggests in its briefing that the Commission is not be permitted to impose conditions on water use permits absent rulemaking. Again, <u>Waiāhole I</u> disposes of that argument. In <u>Waiāhole I</u>, we rejected the state Department of Land and Natural Resources and Department of Agriculture's argument that the Commission must establish IIFS through rulemaking under HAPA. 94 Hawai'i at 151-52, 9 P.3d at 463-64. We explained that the Water Code "provides to the contrary." 94 Hawai'i at 151, 9 P.3d at 463 (citing HRS §§ 174C-3, -71(1)(F)). We determined we could not say the Commission erred in interpreting the applicable administrative rules as permitting the modification of IFS without rulemaking because the rule was ambiguous and we owe deference to agency readings of their own regulations. 94 Hawai'i at 151-52, 9 P.3d at 463-64 (citing HAR § 13-169-49.1 (eff. 1992); <u>Mahaʻulepu v. Land Use Comm'n</u>, 71 Haw. 332, 339, 790 P.2d 906, 910 (1990), <u>overruled on other grounds by</u> <u>Hoʻomoana Foundation v. Land Use Comm'n</u>, 152 Hawai'i 337, 526 P.3d 314 (2023)). We observed that one of the "hallmarks of rulemaking is its 'generality of effect,'" but the Commission's decisions in that case "concerned the [IIFS] of particular streams." 94 Hawai'i at 152, 9 P.3d at 464 (citing <u>In re HECO</u>, 81 Hawai'i at 466, 91 P.2d at 568).
    Here, like the applicable statute in in <u>Waiāhole I</u>, HRS § 174C-31(j) authorizes – indeed requires – the Commission to condition water use permits to protect instream flows and maintain sustainable yields of ground water, without any reference to rule-making. <u>See</u> HRS § 174C-31(j) ("[The Commission] <u>shall</u> condition [water use] permits . . . in such a manner as to protect instream flows and maintain sustainable yields of ground water established under this section." (emphasis added)). Moreover, like the establishment of IIFS at issue in <u>Waiāhole I</u>, which concerned particular streams, conditioning water use permits concerns particular water use permits. It does not have a "general effect." <u>See</u> <u>Waiāhole I</u>, 94 Hawai'i at

(continued. . .)

130

Finally, WWC argues the Commission erred when it directed WWC to deliver water to "previous kuleana users of the North Waiehu Ditch" because the Commission did not issue any SWUPs to kuleana users of the North Waiehu Ditch.[85]  The relevant provision of the Commission's D&O II provides, "WWC is required to find a way to provide water from the Waiheʻe Ditch for previous kuleana users of the North Waiehu Ditch (see FOF 17)."[86]  In a separate paragraph, the Commission again directed WWC to "provide water from the Waiheʻe Ditch for previous kuleana users of the North Waiehu Ditch."  As the Hui/MTF and OHA and the Commission point out, this provision arises from WWC's agreement to provide the water in the 2014 agreement.

HRS § 174C-50(a) (2011) provides that "[a]ll existing uses of water in a designated water management area, except those exempted from regulation by this chapter, may be continued after the effective date of designation only with a permit issued in accordance with sections 174C-51, 174C-52, and 174C-53(b)."

---

152, 9 P.3d at 464.  Thus, like the appellants' argument in Waiāhole I, WWC's rule-making argument fails here.

[85]    The Hui/MTF and OHA state that at least one North Waiehu kuleana landowner applied for a permit and received provisional recognition of appurtenant rights, but that the Commission ultimately denied their SWUPA without prejudice because they did not appear at the hearing.

[86]    FOF 17 makes findings regarding the 2014 agreement, including that it provided WWC would deliver "water to the kuleanas previously provided water from the North Waiehu Ditch."

The Commission is required to protect appurtenant rights under Article XI, Section 7 of the Hawai'i Constitution. Additionally, many users with appurtenant rights seek to exercise traditional and customary Native Hawaiian rights protected by the Hawai'i Constitution. See Haw. Const. art. XII, § 7. Consistent with these constitutional protections, sections 174C-63 and 174C-101(d)[87] of the Water Code expressly preserve appurtenant rights. HRS § 174C-63 provided,

> Appurtenant rights are preserved. Nothing in this part shall be construed to deny the exercise of an appurtenant right by the holder thereof at any time. A permit for water use based on an existing appurtenant right shall be issued upon application. Such permit shall be subject to sections 174C-26 and 174C-27 and 174C-58 to 174C-62.

HRS § 174C-101(d) further provides, "The appurtenant water rights of kuleana and taro lands, along with those traditional and customary rights assured in this section, shall not be diminished or extinguished by a failure to apply for or to receive a permit under this chapter."

It is by no means clear that kuleana users are required to obtain permits under the Water Code. In any case, the Commission did not abuse its discretion in issuing this directive to WWC because appurtenant rights are expressly

---

[87] Sections 174C-63 and 174C-101(d) were both amended in 2022 in part "to clarify that traditional and customary and kuleana rights to water include rights of use, access, delivery, and quality of water, which shall be recognized and protected." See 2022 Haw. Sess. Laws Act 27, §§ 1, 4-5 at 31-32, 35.

preserved.  The previous kuleana users' appurtenant water rights are not diminished by their failure to apply for SWUPs; they could still do so, and the Commission would be required to issue them such permits.  See HRS § 174C-63.  Therefore, the Commission did not exceed its statutory authority or otherwise err when it directed WWC to provide water from the Waihe'e Ditch for previous kuleana users of the North Waiehu Ditch.

## V.    Conclusion

For the reasons stated above for vacatur or remand, we vacate the Commission's Findings of Fact, Conclusions of Law, and Decision and Order issued June 28, 2021, as amended by Errata issued June 30, 2021.  We otherwise affirm these, as well as the Commission's Minute Order #20, denying MMK's motion for clarification or partial reconsideration, and Minute Order #21, denying Mahi Pono's motion for partial reconsideration.  We remand to the Commission for further proceedings consistent with this opinion.

Wil K. Yamamoto     /s/ Mark E. Recktenwald
(Jodi S. Yamamoto, with
him on the briefs)     /s/ Sabrina S. McKenna
for MMK Maui, LP

             /s/ Todd W. Eddins

Trisha H.S.T. Akagi
(David Schulmeister and   /s/ Henry T. Nakamoto
Michi Momose, with her
on the briefs)       /s/ Kirstin M. Hamman
for Mahi Pono, LLC



Isaac H. Moriwake
for Hui O Nā Wai 'Ehā and
Maui Tomorrow Foundation

Paul R. Mancini
(James W. Geiger, with
him on the briefs)
for Wailuku Water Co.

Miranda C. Steed
(Julie China and
Linda L.W. Chow, with
her on the briefs)
for Commission on Water
Resource Management

Pamela W. Bunn
(Judy A. Tanaka, with
her on the briefs)
for Office of Hawaiian
Affairs